ESTATE OF DELLA WALKER VAN LOBEN SELS, DECEASED, WELLINGTON S. HENDERSON, SR. AND BROOKS WALKER, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Van Loben Sels v. Commissioner
Docket No. 30439-81.
United States Tax Court
T.C. Memo 1986-501; 1986 Tax Ct. Memo LEXIS 106; 52 T.C.M. (CCH) 731; T.C.M. (RIA) 86501; October 2, 1986. *107 Hart H. Spiegel,Thomas A. Welch, and Robert C. Livsey, for the petitioner. G. J. Beaudoin, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In his statutory notice respondent determined a deficiency of $2,446,096 [1] in the Federal estate tax due from the Estate of Della Walker van Loben Sels. After numerous concessions, the issues for decision are: (1) The fair market value of certain undivided minority interests in timberlands held by the decedent on the date of her death; and (2) Whether certain gifts made by the decedent during her lifetime to her grandchildren were made in contemplation of death within the meaning of section 2035. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached *108 thereto are incorporated herein by reference. Della Walker van Loben Sels ("decedent") was a resident of Carmel, California, when she died at the age of 100 on February 10, 1978. Wellington S. Henderson, Sr., the husband of decedent's daughter Harriet, and Brooks Walker, decedent's son, were appointed co-executors of the estate. The estate (petitioner) timely filed an estate tax return with the District Director of Internal Revenue, San Francisco, California. On the return, the estate claimed a total value of $1,589,750 with respect to decedent's undivided interests in certain real property, undivided interests in various rights to real property, and undivided interests in various mineral rights in real property. In the notice of deficiency, respondent concluded that the decedent's undivided interests in the aforesaid real property, rights to real property, and mineral rights in real property had a total value of $5,652,905 and determined a deficiency in the estate tax due from the estate of $2,446,096. At trial, respondent moved to increase the deficiency by $1,937,779 to the $4,383,875 now in controversy. The increase in deficiency was due to respondent's conclusion that *109 the decedent's undivided interests in the various properties had a value on the date of her death of $9,414,572, instead of the $5,652,905 used in the deficiency notice. The parties agree that at the date of her death decedent owned an undivided interest in land, timer, and minerals in certain real property located in King, Kern and Madera counties, California, which had a total fair market value of $89,750, and that decedent's interest in such property is in addition to the undivided interest which she held in the land and timber properties in controversy. The parties also agree that the date of death fair market value of decedent's undivided interest in a geothermal resource contained in one of the parcels of property at issue herein, is $6,203 and that this value is separate and apart from decedent's interest in the land and timber included in that parcel. The parties further agree that the only valuation issue to be decided in this case is the date of death fair market value of the undivided minority interests held by decedent in eleven "blocks" or "tracts" of timber and timberland located in northern California. These properties, the percentage of undivided interest owned *110 by decedent in each, the number of her co-owners in each tract, and the total acreage in each tract or parcel are set forth below: Decedent's Undivided
Number of Other
Ownership Unit
Percentage
Co-Owners
Acres [3]
Agency 1
2.48134975
28 566
Area 1
24.37150
7
21,355
Area 2
24.37145
7
280
Area 3
24.37153
7
23,849
Agency 5
4.96279
29 319
Area 5B
9.12318
30 26
Area 6
25.82349
7
5,054
Area 6A-2
25.82349
7
305
Area 8
25.82349
7
26,045
Firth
25.0000 3
1,583
Montgomery
25.0000 3
323
TOTAL
79,705
The above tracts or parcels of property were originally acquired around the turn of the century by John E. Andrus and Thomas B. Walker, an ancestor of decedent. Andrus and Walker accumulated the properties in the Red River Company and the Waland Lumber Company in which they were equal shareholders. By a series of liquidating distributions beginning in 1941, both of these corporations *111 were liquidated with undivided interests in the properties being distributed to their then current shareholders, most of whom were members of the Walker and Andrus families. All of the distributed properties, designated as "Agencies" and numbered sequentially, were held in joint ownership by the former shareholders for several years. However, in a series of transactions between 1956 and 1960, the Ralph L. Smith Lumber Company purchased a total of 26 percent of the undivided interests in the properties from members of the Walker family. In 1961, the Ralph L. Smith Lumber Company was merged into Kimberly-Clark Corporation (hereinafter sometimes referred to as "K-C") and K-C succeeded to and thereafter had the undivided interests (26 percent) of Ralph L. Smith Lumber Company. In February of 1966, K-C requested that all of the owners of the undivided interests agree to have the properties partitioned in kind. In October 1967, a partitionment agreement was executed by all of the owners and the partitioning process commenced. It was accomplished without litigation. Because of fluctuations in the price of timber, new cutting contracts were not entered into during the period of partitionment *112 except for salvage sales of dead or dying trees. The partition was completed in 1971. [4] All of the jointly owned properties were partitioned, except for portions of Agency 1, Agency 4, Agency 5 and Agency 7. The segments of the partitioned Agencies were redesignated as "Areas" and were also numbered sequentially. In the agreed partition, K-C received a fee interest in approximately 177,363 acres of timber property, and retained its undivided interests in 1,375 acres in the segments of the Agencies which were not partitioned. The "Clinton Walker group," of which decedent was a member, received undivided interests in certain Areas, and retained their undivided interests in the segments of the Agencies which were not partitioned. The Clinton Walker group then engaged in certain exchanges with other owners in an attempt to consolidate the properties for better management. The First lands and Agency 6A-2 were also partitioned at this time, and as a result decedent obtained undivided interests in certain other Areas. *113 From 1970 to the date of trial all of the properties in which decedent owned undivided interests were under the control and management of W. M. Beaty and Associates, a corporation which specializes in the management of timberlands. For the years 1971 through 1979 the annual net income realized from the Walker properties ranged from a low of $1,614 [5] to a high of $622,978. The average annual net income for the five years preceding the date of death (1973-1977) was $153,710. The average net income for the two years preceding the date of death was about $240,000. Under the supervision of W. M. Beaty and Associates and with the permission of the owners of at least a majority of the undivided interests the properties were being managed during this period in such a manner as to conserve and increase the value of the underlying asset (the timber) for the future rather than to maximize current income. In other words, management was attempting to grow more timber than was sold in each year. According to Brooks Walker, decedent's son and the owner of undivided interests in the properties, it had always been his understanding that at least the members of the Walker family had no real *114 interest in partitioning the properties and the problem associated with and the results obtained in the one exception, the K-C partitionment, tended to confirm his understanding that the family would resist any further partitioning of the properties. During the last 25 years of her life, the decedent made numerous gifts. The gifts, numbering more than 200, were made mostly to her children and her four grandchildren, Brooks Walker, Jr., John S. Walker, Wellington Henderson, Jr., and Ann McKeever. The gifts were mostly in cash and in amounts of either $3,000 or $6,000 and were generally made on the first day of each year. However, cash, real estate and securities with values of much higher amounts were given to members of her family in 1953 and again in 1959. A will executed by decedent on April 17, 1972, initially contained a bequest to her granddaughter, Ann McKeever, of a sum of money equal to the value of a residence which decedent owned at Lake Tahoe. However, in March 1975, decedent transferred her residence at Lake Tahoe by gift to Ann McKeever who at that time was in her mid-twenties, was about *115 to be married, and was the only grandchild without access to a residence at Lake Tahoe. Two days after transferring the residence to her granddaughter, decedent executed a codicil to her will of April 17, 1972 by which she deleted the provision relating to the Lake Tahoe property. The Lake Tahoe residence was sold by the granddaughter in July 1978 for $225,000. In September following the gift of the Lake Tahoe residence to her granddaughter, decedent made a gift of bonds having a total value of $282,395 to her other three grandchildren. The gifts to the other grandchildren were made at the suggestion of decedent's grandson, Wellington Henderson, Jr. and were made in order to equalize the total gifts made by decedent to the grandchildren. It was decedent's policy to treat her grandchildren equally. The Tahoe residence and the bonds comprised less than 6 percent of decedent's estate. Decedent was hospitalized in 1973 and was diagnosed as suffering from degenerative heart disease (congestive heart failure) and aortic sclerosis. Her condition, however, was controllable by medication and even though she visited her doctors more frequently thereafter, she remained quite active. For *116 instance, until she was again hospitalized in February 1976 she walked a minimum of a mile each day and frequently traveled from Carmel to San Francisco. She also continued to dine out and to accept social invitations from friends. Upon being rehospitalized in 1976 she was suffering from a severe cough and weakness. At that time, her physician found that her heart condition had worsened and was exacerbated by an anemic condition which was becoming severe. Nonetheless, she recovered and became somewhat active again at least to the extent that on her 100th birthday, she celebrated at the Burlingame Country Club with a large party which was attended by an older sister, Alma Brooks Walker, who was then 103. [6] Decedent died on February 10, 1978 from complications with a broken hip received in a fall. OPINION Valuation of Decedent's Undivided Interests in Timber and Land
As set out in more detail in our findings, decedent owned on the date of her death an undivided interest in eleven non-contiguous parcels of timberland comprising *117 a total of 79,705 acres. The parcels ranged in size from 26 acres to 26,045 acres and decedent's undivided interest in the parcels ranged from 2.48134975 percent to 25.82349 percent. The number of her co-owners in the various parcels ranged from three to thirty. For estate tax purposes, the estate claimed a value of $1,589,750 with respect to decedent's undivided interests in real property including certain timber and mineral rights. The parties are in agreement with respect to the value of her interest in the mineral properties as well as the value of a geothermal interest which she had in one parcel. The parties have also agreed upon both the amount of timber and the number of acres embraced within each of the various parcels of real property in which she had an interest. Consequently, the only remaining valuation issue is the value of decedent's various undivided interests in land and timber. Insofar as applicable here, Rule 142(a) provides that in proceedings before this Court the burden of proof is on petitioner, "except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answers, it shall be upon the respondent." (Emphasis *118 added.) In the instant case, the emphasized exception in Rule 142(a) is applicable because in the statutory notice respondent determined a deficiency of $2,446,096 based upon a value of $5,652,905 for decedent's interests in the timber and timberland; [7] but respondent subsequently amended his answer to assert a value in excess of $5,652,905 and at trial, respondent introduced an appraisal report prepared by John Miles and Stanley Richards of National Resources Management Associates (NRM Associates or NRM) in which the appraisers concluded that the value of her ownership at the date of death was $9,414,572. As a result of the revised values determined by the appraisers, respondent amended his answer to increase the estate tax deficiency by $1,937,779 to $4,383,875. Under these circumstances, respondent has the burden of proof to the extent of any value for decedent's interests in excess of the $5,652,905 upon which the original deficiency was based. Petitioner *119 has the burden of proving that decedent's interests had a value of less than $5,652,905. Anselmo v. Commissioner,80 T.C. 872, 886 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). See also Beek v. Commissioner,80 T.C. 1024, 1033 (1983), affd. 754 F.2d 1442 (9th Cir. 1985); 212 Corporation v. Commissioner,70 T.C. 788, 800 (1978). Under section 2031(a) the gross estate of a decedent includes the value at the death of the decedent of his or her interest in "all property, real or personal, tangible or intangible, wherever situated." Where as here the interest of the decedent is an undivided minority interest in real property including timber, the amount to be included in the estate is the fair market value of the undivided interest.See Porter v. Commissioner,49 T.C. 207 (1967); Estate of May v. Commissioner,8 T.C. 1099, 1104 (1947); Estate of Campanari v. Commissioner,5 T.C. 488 (1945). In such situations, however, the undivided minority interest in jointly owned property is determined by reference to the value of the underlying fee. The aliquot portion *120 of the whole fee represented by the minority interest is then adjusted for any applicable discount. Estate of Campanari v. Commissioner,supra.[8] A similar method of valuation is often used with respect to a minority interest in a partnership or shares representing a minority interest in a closely held corporation. Estate of Andrews v. Commissioner,79 T.C. 938 (1982). [9]
Therefore, in this case, the beginning point in our search for the value of decedent's undivided interests in the timber and land is a determination of the value of the fee in such properties. The Estate Tax Regulations offer little guidance in the selection of an appropriate method for valuing timber property.However, section 1.611-3(f)(2) of the Income Tax Regs. specifically provides that in valuing timber, the valuator "will give weight and consideration to any and all facts and evidence having a bearing on the market value, such as cost, actual sales and transfers of similar properties." [10] Furthermore, *121 where available the use of comparative sales is the method most preferred not only by this Court but also by the Court of Appeals for the Ninth Circuit, the circuit to which this case is appealable. See Harwood v. Commissioner,82 T.C. 239, 267 (1984), affd. per order 786 F.2d 1174 (1986); Buse v. Commissioner,71 T.C. 1129, 1136, 1137 (1979).See also United States v. 100 Acres of Land,468 F.2d 1261, 1265 (9th Cir. 1972), cert. denied 414 U.S. 864 (1973), where in a condemnation case the Court of Appeals stated: Ordinarily if there are sales of comparable property at or near the time the condemned property is taken, evidence in regard to such sales would be more appropriate then any other method in determining the market value of the property taken * * *. *122 The selection of comparable sales is substantially a matter of judgment. In the present case respondent's appraisers, John Miles and Stanley Richards of NRM Associates, obviously spent a great deal of time and effort in identifying arms-length sales of land and timber, which were made as near to decedent's death and possessed physical characteristics as nearly like those of the subject property as possible. Respondent's Timber Valuations
In its valuation of the timber on the tracts in which decedent had undivided interests NRM relied in part on 24 sales of stumpage totaling 17,000 million board feet ("MBF") ("Walker Stumpage Sales"). These sales were believed by NRM to be the most comparable because of their similar characteristics and their proximity in time to the valuation date and in location to the subject property. In addition, NRM used seven other transactions involving timber and land in the same general vicinity. Of these sales the ones most heavily relied upon by NRM's appraisers were the sale in September 1978 of 68,176 acres and 334 MBF of timber by Publishers Forest Products Co. to Sierra-Pacific Industries; the sale in September 1979 of 322,293 acres *123 and 1562 MBF of timber by Kimberly-Clark to Roseburg Lumber Company; and the sale in June 1977 by Long and Laxague to D. G. Shelter. The prices of the sales considered comparable were adjusted by NRM for differences in timber, quality, accessibility and other logging costs, volume, species mix, and time of sale. Using these adjusted sales of timber as comparables NRM concluded, and respondent contends, that the total value of the timber on the land in which decedent had an undivided interest was $29,500,000 at the date of her death. Petitioner, however, contends that the sales upon which respondent's appraisers relied involved timber which was not comparable to the timber in which the decedent had an undivided interest. Petitioner also contends that the sales used as comparables by respondent's appraisers were not properly adjusted to bring them into comparability. A brief discussion of each point of substantial difference between the parties with respect to the NRM timber appraisal is believed pertinent. First, the Walker Stumpage Sales consisted of a series of 24 small sales of timber totaling only 17,000 MBF. Petitioner contends that NRM's use of these small sales as comparables *124 erroneously assumes that the entire 387,713 MBF of timber in which decedent owned an interest could be sold at one time in what amounted to a "retail" market according to petitioner because of the small size of each of the Walker sales. Petitioner argues that these smaller sales of stumpage sold at "retail" prices must be adjusted downward to arrive at a "wholesale" price since we in effect are assuming that all of the timber that decedent held an interest in could be sold at one time. Examination of the detailed analysis made by NRM of all the comparable sales relied on in making its fair market value determination fails to reveal that there was any substantial price differential between sales of large volumes of standing timber and sales containing smaller volumes. In fact, the prices received for the small sales of Walker timber corresponded rather closely with those received in the Publishers and Roseburg transactions. Consequently we conclude that the Walker sales are comparable for our purposes. [11]
With respect *125 to the sale of the Publishers tract to Sierra-Pacific, petitioner contends that NRM's use of this sale as a comparable is in error because: (1) the Publishers sale contract called for only 334 MBF but the actual timber inventory was in excess of that amount; (2) there is a significant difference between the Publishers timber and that on the subject property; (3) the time adjustment made by NRM is improperly computed; and (4) the adjustment made by NRM for logging cost differentials is also improper. Mr. Tomascheski, the forest manager for Sierra-Pacific (the buyer) in this transaction, testified that he appraised the timber and the land involved for Sierra-Pacific and that while he was convinced at the time of the purchase the volume of timber was significantly greater than the 334 MBF recited in the contract, Sierra-Pacific was not aware of any excess until a timber inventory was made after the purchase. Under these circumstances we believe that NRM reasonably relied upon the sale contract for the volume of the sale because, for purposes of a fair market determination only the facts known to both parties at the time of a comparable transaction are relevant. See Buse v. Commissioner,71 T.C. 1129, 1136 (1979). *126 Petitioner next asserts that the Publishers sale should have been adjusted further for the "considerable and pure hardwood stands," as well as for a significant amount of virgin old growth included therein. With respect to the hardwood stands both parties admit they have little, if any, commercial value to a potential investor and their volume is so small in comparison to the total volume of timber as to discourage a separate percentage breakout. Furthermore as pointed out by respondent neither NRM nor Dean Solinsky, one of petitioner's experts, assigned any value to the 5,773 MBF of hardwood contained in the Walker properties. Under these circumstances it appears that respondent was reasonable in his determination that the price paid by Sierra-Pacific was for the mixed conifer species and not for any hardwoods. With respect to the virgin old growth NRM made an adjustment for the superior quality of this timber, but petitioners allege that the adjustment is inadequate. After careful consideration we disagree and conclude that petitioners have not shown respondent's quality adjustments in this respect to be erroneous. Petitioner's next contention concerns NRM's allocation *127 of the additional cost of recovering certain high value timber located on steep and unroaded parts of the Publishers tract. NRM determined that approximately 60 percent in value of the timber was located on steep and generally unroaded terrain and concluded that, as of the sale date, it would have cost an additional $43/MBF in road construction and cable logging to recover this timber. NRM prorated this additional cost over all of the different species of timber contained in the entire Publishers tract by applying an across-the board logging cost adjustment of $25/MBF. Petitioner asserts that only the highest value timber was in fact located in the unroaded areas, whereas the lower value timber was in areas that were no less accessible than the properties in which decedent owned undivided interests. Thus, petitioner disagrees with the across-the-board manner in which NRM adjusted for the logging cost differentials. We have carefully examined the methods presented by both parties and are not convinced that petitioner has demonstrated that NRM's calculations are erroneous with regard to timber quality and logging cost adjustments to this sale. Petitioner's final contention is with *128 respect to the time adjustment made by NRM for the period from the date of the Sierra-Pacific sale (September 27, 1978) to the valuation date (February 10, 1978). To make the adjustment NRM used price level data which included the average price experience from 1970 through 1980. Petitioner asserts that the inclusion of data starting 8 years before the relevant adjustment span was "recklessly distortive". Petitioner's expert witness on this point Glenn Zane, used the same source data that was used by NRM but Mr. Zane selected quarterly figures, rather than annual. His figures, therefore, were directly relevant to the three calendar quarters in the adjustment span (January 1978 through September 1978). Mr. Zand then applied the individual rates of change on a per species basis weighted by the actual volumes of timber on the lands in which decedent held undivided interests. In this manner, Mr. Zane computed a trend line change of 35 percent for the period at issue instead of the 30.9 percent annual change rate used by NRM. Because of the rapid price appreciation occurring during the period between decedent's death and the Sierra-Pacific sale, the use of experience data for *129 the actual time period at issue would produce a more accurate rate of adjustment. We are satisfied, therefore, that NRM's time adjustment was unreasonably low and that a reduction in NRM's fair market determination for the subject properties is warranted. [12]
With regard to respondent's use as a comparable of the sale by Kimberly-Clark to Roseburg Lumber Company in September 1979 petitioner asserts that respondent made several errors which are set forth and discussed below. This transaction involved the sale of 322,293 acres of land, 1,562 MBF *130 of timber, and two sawmills for $253 million. In the contract of sale the parties allocated $2,361,000 to the sawmills. In its appraisal, NRM concluded that the values allocated by the parties to the mills and their equipment may have been based upon tax considerations and decided to increase the value allocated to the mills by $10 million. Petitioner complains that the adjustment was arbitrary and inadequate but has failed to provide any specific evidence of a more accurate value for the mills. Furthermore, in view of the volume of timber and the acreage included in the sale we are inclined to believe that any change in the allocation of value to the mills would have to be substantial in order to have more than a minimal effect upon the overall timber values reflected in the transaction. Consequently, the presence of some uncertainty regarding the portion of the purchase price to be allocated to the non-timber assets does not in our opinion preclude the use of the sale as a comparable. [13]
*131 In connection with the Roseburg sale petitioner also contends that NRM improperly assumed that the proportion of 12 inch to 19 inch DBH [14] timber as opposed to 20 inch DBH and over in the Roseburg sale was identical to the proportion of such timber in the Publishers sale. This was an assumption made by NRM in order to determine the breakdown between the large and small timber in each species covered by the Rosenburg sale. Since the species breakdown, the size breakdown and the allocation between them of the total sale price paid is essential to the valuation process, and hence to the use of the Rosenburg transaction as a comparable sale we are convinced that petitioner's criticism is valid and that the use by NRM of the arbitrary and unsubstantiated assumption is improper. Finally with respect to the Rosenburg sale, petitioner argues that the sale contained a premium for which respondent failed to make any adjustment. Two of petitioner's experts, Dean Solinsky and Glenn Zane, performed an appraisal in connection with the sale of the property to Roseburg in September 1979. They both testified that in their opinion Roseburg paid a substantial *132 amount over the fair market value of the property in order to establish Roseburg in the California market and to obtain a supply of chips for the 5 chip mills Roseburg was operating in Southern Oregon. In view of their personal involvement as appraisers in the Roseburg transaction, we are convinced petitioner's experts were in a better position to determine the presence or absence of a premium than anyone else. Furthermore, Stanley Richards of NRM acknowledged that Zane's appraisal of the property was 25 percent below the price Roseburg actually paid. We conclude, therefore, that respondent's appraisers erroneously failed to consider and to make an adjustment for a purchase premium which was included in the Roseburg sale. Respondent's Valuation of the Underlying Land
With one exception, NRM used the same sales as comparables for valuing the underlying lands as it used in valuing the timber. From an analysis of the sales of land included in these transactions NRM concluded, and respondent contends, that the total value of the land in which decedent had an interest was $9,500,000 on the date of her death. Petitioner contends that the land values found by NRM are overstated *133 for the reasons discussed below. First petitioner points out that NRM failed to classify the subject lands by timber quality or with the presence or absence of premerchantable timber. Petitioner then notes that NRM failed to make any adjustment for the acreage that was barren and had no merchantable or premerchantable timber. Instead, NRM assumed a uniform, per-acre value, which was equivalent to fully-stocked properties. On the other hand, Dean Solinsky one of petitioner's appraisers, examined and classified each site individually, assigned pertinent per acre values to each, including reduced values for the 25 percent which was not stocked. At trial and on brief respondent made no attempt to rebut petitioner's assertions in this respect, and accordingly, we conclude that a downward adjustment in NRM's resultant land values is required. NRM used the Publishers sale as a comparable in its determination of land values with adjustments for adverse dissimilarities in the topography of the Publishers land and for the access problems, greater erosion, and increased management and logging costs associated with that land. Petitioner insists, however, that some of the dissimilarities *134 assumed by NRM are substantially greater than those warranted by the evidence. For instance NRM predicated its 40 percent upward adjustment to the Publishers sale price on the assumption that there were 30,000 acres of steep terrain with access problems on the Publishers lands whereas there are, in fact, only 22,000 such acres. Here again we conclude that respondent's determination of the value of the lands in which decedent had an interest is in error and should be adjusted downward. [15]
*135 Petitioner's Valuations
Dean Solinsky, one of petitioner's experts, utilized two approaches to arrive at his estimate of the value of the undivided interest of decedent in the timber. The first, referred to as the "stumpage cutout method," began with a determination of the value of the total interest in the timber by using comparable transactions. Using this value and assuming a 15-year ratable liquidation period for the timber having a diameter of 20 DBH inches or more at the valuation date, Mr. Solinsky computes a stream of income flowing from the timber similar to an annuity. By discounting the income stream at 12 percent he obtains a present value at date of death of $2,487,243 for her interest in such timber. With the respect to the young timber (12 to 18 inches DBH) he assumes that it will all be liquidated in the fifteenth year. His present value for the smaller timber, discounted at 12 percent for the full 15 year cutout period, is $399,597. For decedent's interest in the underlying land, Mr. Solinsky analyzed the timberland values published by the State Board of Equalization for property taxation in the Pine-Mixed Conifer Region of California and arrived *136 at a value, as of the decedent's date of death, of $1,355,957. In his second approach Mr. Solinsky valued decedent's interest in the land and timber by using the historical income method by averaging the net income generated from timber cutting on the subject properties by W. M. Beaty & Associates for the five year period immediately preceding the valuation date. The average net income attributable to decedent's interest was then capitalized at seven percent to arrive at a value of $2,195,857. By averaging this value with the value determined under the stumpage cutout method Mr. Solinsky arrived at a fair market value of $3,000,000 for decedent's interest in the land and timber. William McKillop, another of petitioner's experts, used a "present value," or discounted cash flow, analysis to determine a value for the decedent's undivided interest in the timber and timberlands. In his computation, Mr. McKillop assumed that a potential purchaser of the undivided interest could foresee two possible financial outcomes to his purchase: (1) He would be able to force partition of the properties and after some delay be able to liquidate the timber and sell the land; or (2) If partition *137 and liquidation were not feasible, the purchaser would be forced to accept a future income approximately equal to that which the decedent's undivided interest had produced in the recent past (the "historical" income method used by Mr. Solinsky). Mr. McKillop concluded that the overall valuation of the hypothetical purchaser (ignoring acquisition costs and the costs associated with partition) would be an average of the two alternative income streams. If partition were deemed feasible, Mr. McKillop assumes that the process would take about six years during which there would be 6 harvests producing an average of $183,737 per year for a total of $1,102,422. Mr. McKillop then assumes that it would take 7 years to liquidate the timber at an average annual harvest of $937,437 or a total of $6,562,059. Based upon these assumptions and using a 7 percent interest rate, Mr. McKillop calculates the value as of the decedent's date of death of the timber harvests to be $3,682,983. With respect to the underlying land McKillop assumes that it would be sold off as each of the liquidation harvests is completed. Using a 7 percent interest rate, McKillop calculates the value of the income stream *138 from the land sales to be $719,562 as of decedent's death. In this manner, Mr. McKillop determined that the value of the land and timber as of February 10, 1978 is $4,402,545 ($719,562 + $3,682,983) and concludes that this would be the most that a potential buyer would pay for the decedent's undivided minority interest assuming that a partition could be achieved. If partition was deemed not feasible, Mr. McKillop concluded that the hypothetical buyer of decedent's interest would have to determine a purchase price by reference to the income stream that the decedent's undivided interest had produced in the recent past. Again using a 7 percent interest rate, and the average net income from decedent's undivided interest for the preceding five years, Mr. McKillop calculated the value of decedent's interest to be $2,195,857 and concluded that a rational buyer would pay no more than that amount for decedent's interest if the buyer believed that partition and liquidation were not practical. In final analysis, Mr. McKillop arrived at his estimate of the fair market value of decedent's interest as being approximately $3,300,000 by averaging the results of his two calculations ($2,195,857 *139 plus $4,402,545 divided by 2). We have carefully reviewed the testimony, reports and calculations of Mr. Solinsky and Mr. McKillop and, while they have many appealing features, we are unable to agree with their final conclusions. First, both Solinsky and McKillop base their valuations, at least in part, on the assumption that future net income from the properties will parallel the net income in the past. This assumption is questionable in light of the volatile nature of the timber industry during the years in issue. Furthermore, we are not persuaded that a prospective buyer would value the subject interest by capitalizing its past earnings especially, where as here, the evidence introduced by both parties establishes beyond question that the Walker properties were being managed by W. M. Beaty & Associates so as to increase the value of the underlying asset (the timber) and not to maximize current income. See Harwood v. Commissioner,82 T.C. 239, 265 (1984), affd. per order 786 F.2d 1174 (1986). Solinsky and McKillop also assume that timber will be harvested over specified periods. After a careful study of the record, we are not satisfied that *140 petitioner has adequately supported this assumption. Mature timber may not be harvested within a specified period of time and at times is held for anticipated appreciation in value. [16]Harwood v. Commissioner,supra at 267. The assumption made in this case by both Solinsky and McKillop that all the timber and land would be liquidated was directly contradicted by Brooks Walker, Jr. who testified that the intention of the Walker family was to hold the subject lands for future generations. Thus, decedent's co-owners did not intend to dispose of the timberlands as the experts assumed. Finally, our prior decisions in such cases as Porter v. Commissioner,supra;Estate of Campanari v. Commissioner,supra; and Estate of May v. Commissioner,supra, clearly indicate that where the amount to be included in an estate is the value of the decedent's undivided interest in real *141 property, such value is to be determined by reference to the value of the fee. Furthermore, the preferred method of determining the value of the fee is the use of comparable sales. Harwood v. Commissioner,supra;Buse v. Commissioner,supra, and United States v. 100 Acres of Land,supra. We conclude, therefore, that decedent's undivided interest in the timber and timberlands is her aliquot portion of the fee in such properties after an appropriate adjustment, if any, for the fact that it is a minority interest. Although we are convinced that the comparable sales method adopted by respondent and his appraisers is clearly appropriate for arriving at the total value of both the timber and the land, their analysis of comparable sales contains material errors which we have pointed out and discussed hereinbefore. First, we have found that NRM failed to properly adjust for the time differential with regard to the Publishers and Roseburg transactions. Secondly, NRM arbitrarily assumed that the tree sizes within each species of timber included in the Roseburg sale were identical to the timber included in the Publishers sale. *142 Thirdly, NRM failed to consider and adjust for a substantial purchase premium in the Roseburg sale. Fourthly, with respect to land values, NRM failed to adjust its comparables for that portion of the subject lands which were barren and assumed that the Publisher lands contained 30,000 acres of steep terrain with access difficulties when there were only approximately 20,000 of such acres. To take these errors into account we conclude that NRM's appraisal of $39,000,000 for the total value of the land and timber as set forth at page 39 of its report should be reduced by 20 percent from $39,000,000 to $31,200,000. We also conclude that the reduction is to be spread rateably over the land and timber in accordance with the stipulated acreage and volume of timber in each tract. Value of Decedent's Aliquot Portion of Total Fee
Inasmuch as the parties have stipulated the decedent's percentage of interest in each tract of timber and land the value of her aliquot portion of the total value is purely a mathematical calculation to be done as part of the computation under Rule 155 which is hereinafter directed. Minority Discount
The last step in the valuation process *143 is the determination of the amount of discount, if any, to be applied to decedent's aliquot portion of the total values in order to properly account for the fact that decedent owned an undivided minority interest in each tract. Respondent contends that no discount is warranted. Petitioner contends that a discount of at least 60 percent is warranted. In spite of respondent's contention that no minority discount is allowable in this case, his experts testified to the contrary. [17] Stanley Richards, one of NRM's appraisers, stated that if he had been asked to value the properties in issue with reference to the fractional nature of decedent's ownership interest, he would have made a downward adjustment. Another of respondent's experts, Harold Bowman, testified that while he "did not work out any numbers" he thought that a minority discount of 20 percent would be warranted based on all of the disabilities associated with an undivided interest. Mr. Bowman was a forester with the Ralph L. Smith Lumber Company and subsequently with the Kimberly-Clark Corporation. He participated in and was familiar with the 1967-1971 partitionment of the Kimberly-Clark/Walker family timberlands. *144 Barney Dowdle, another of respondent's expert witnesses, endorsed the procedure used by NRM of first estimating the fair market value of the properties in question as if they were held in fee simple. In his opinion, however, NRM failed to take the additional but necessary step of discounting the fee simple fair market value for the undivided minority nature of decedent's interest. In fact, respondent's experts testified uniformly that they had not been requested to consider whether a minority discount was appropriate and the experts who prepared the NRM appraisal admitted that they had been retained by respondent solely to value the subject properties as if they were owned in fee simple. One of petitioner's expert witnesses, Dixon Sandberg, testified as to the discount which is applicable to a minority undivided interest in timberlands. He, too, had worked for Kimberly-Clark Corporation and had participated in the purchase in 1961 by Kimberly-Clark of the undivided interest in timberlands owned by Ralph L. Smith Lumber Company. Mr. Sandberg had the responsibility of "evaluating those properties from the buyer's standpoint." He testified that the purchase price paid by Kimberly-Clark *145 was discounted by 40 to 60 percent from fair market value to reflect the fact that the interest being purchased was an undivided minority interest. Mr. Sandberg also noted that it was approximately nine years after the acquisition of the interest before Kimberly-Clark was able to realize income from the interest in accordance with its own management prerogatives. Consequently, according to him a potential purchaser of the decedent's undivided interest would base his purchase price in part on the fact that he could expect to encounter a significant delay in gaining direct access to the fee. During such delay the purchaser would have to be content with whatever income was being produced under the management plan in existence at the time of the purchase and over which he would have no control. This factor would be especially critical in the instant case where the properties were being managed so as to increase the value of the underlying asset rather than to maximize current income and there is no indication that a purchaser of the decedent's interest would be successful in an attempt to convince the other co-owners (ranging in number from 3 to 30 depending on the tract) to accelerate *146 the harvesting of the timber. Therefore, a buyer with knowledge of the circumstances would pay no more than the amount necessary to generate what he could with reasonable assurance expect to receive as a return on the investment (i.e., the flow of income generated by a management program over which he would have no control). According to Mr. Sandberg, a second alternative that would be considered by a potential purchaser of the decedent's interest would be to seek a partition of the properties in order to acquire full fee ownership of a part of the property. If successful, such a partitionment would permit the purchaser to harvest his or her timber in accordance with their own investment objectives. Partitionment, however, is generally a lengthy and expensive process, usually covering at least 6 years, but the time consumed is largely dependent upon whether the partitionment is by agreement or litigation, the amount and nature of the property involved, and the number and nature of the co-owners. Initially it consists of a "cruise" in which the timber in each designated tract is inventoried by size, class and species. Because of the obvious difficulties inherent in performing *147 such a procedure with fluctuating timber volumes and prices, there is of necessity a general moratorium on cutting contracts during the partition process. For this reason, the cutting of timber (and the resulting income therefrom) decreases sharply during any partitionment. On the discount issue, both parties have devoted considerable discussion to a sale which occurred one month before the valuation date of February 10, 1978. The sale involved an undivided 33.89251 percent interest in lands ("the Almador tract") that Kimberly-Clark had acquired in the 1967-1971 partition. This interest was sold by Kimberly-Clark to the Walker family who owned the remainder of the interest in the tract. Respondent contends that the fee value of the tract was $1,500,000 at the time of the purchase, that the sale price for the undivided 33.89251 percent interest was $500,000 and consequently there was little, if any, discount for the undivided interest [(.3389251) (1,500,000) = 508,388]. For the value of the fee, respondent relies on a March 1, 1974 appraisal of the fee at $1,500,000 by Robert Shaw which was commissioned by Kimberly-Clark for use in defending a proposed increase in property tax. *148 Mr. Shaw appraised the same tract at $4,444,000 [18] on May 1, 1980. Petitioner contends that the difference between the March 1, 1974 appraisal ($1,500,000) and the May 1, 1980 appraisal ($4,444,000) should be prorated over the 74 months between the two appraisal dates to arrive at a value of $3,330,000 for the fee as of the 1978 sale date and a value of $1,128,620 for the undivided interest. Thus, according to petitioner's analysis, the $500,000 purchase price for the undivided interest reflects a minority discount of 56 percent. [19]
*149 Even if we assume that respondent is correct and that Kimberly-Clark and the Walker family relied upon the 1974 appraisal at least to some extent in the determination of the $500,000 price for the sale in 1978, the subsequent appraisal by Mr. Shaw clearly indicates that the value of the property appreciated significantly between 1974 and 1980 (from $1,500,000 to $4,444,000). Contrary to respondent's assertion, at least a portion of this appreciation must have occurred during the period between the 1974 appraisal and the sale in 1978. In the absence of any evidence of the occurrence of any event or events tending to cause an uneven increase, petitioner's argument for proration of the increase is logical. In any event, there is sufficient basis for an inference that a substantial discount was involved in the sale. In so finding we have considered, but can attribute little weight to respondent's attempt, apparently as an after-thought, to downplay the use of this sale as any evidence of a minority discount by noting that the sale may not be a valid comparable for our purposes since the record contains some evidence that the property involved in this sale was better suited for recreational *150 activities than for timber production. Another expert witness for petitioner was Ross Cadenasso. He attempted to demonstrate the extent of a minority discount for the decedent's undivided interest by comparing her interest to publicly traded stock in corporations having significant timber ownership. According to his computations, stock in such companies with heavy concentrations in timber could have been purchased on the valuation date at prices equal to an average of 21.4 percent of the underlying value of their timber properties. Mr. Cadenasso concluded that a knowledgeable prospective purchaser of decedent's undivided minority interest would approach the transaction on a similar basis. In other words, the buyer would consider a purchase at a price equal to 21.4 percent of the value of the underlying fee. However, in making his comparison, Mr. Cadenasso recognized two dissimilarities in the analogy. The first is the right of the owner of an undivided interest in property to seek a partition. He concluded this right represents a distinct economic advantage to the holder of the undivided interest which the minority stockholder does not have. The second dissimilarity in the *151 analogy is the fact that the holder of stock in any publicly traded corporation has a ready market through which he can quickly and easily sell his stock at its going value.The owner of an undivided interest has no such market. He would be more in the position of the holder of a minority of shares in a closely held corporation. Mr. Cadenasso concluded that a prospective purchaser of decedent's undivided interest in the timberlands would be willing to pay a premium of approximately 30 percent for the prospect of a successful partition of the property and the acquisition of a fee interest. Mr. Cadenasso also concluded that after weighing the differences in marketability between an undivided interest in timber properties and a minority stock interest in a publicly traded timber company, a prospective purchaser would pay considerably less for an undivided minority interest even though the underlying asset values were comparable. In his opinion, a discount of about 20 percent should be applied to the value of the undivided interest to account for this difference. Using a value of $8,590,000 for decedent's aliquot portion of the fee, Mr. Cadenasso illustrated his valuation of the decedent's *152 undivided minority interest as follows: 1. Value of Estate's interest based on (1) ratio of market price to underlying net asset value of publicly traded timber company stocks and (2) the estimated fee interest value of the Estate's timber and timberlands of $8,590,000. 21.4% of $8,590,000
$1,838,000
2. Adjustment to reflect the premium a purchaser would pay for an undivided interest because of the prospect that he could successfully partition the properties and then sell a fee interest. Adjustment: 30% premium
551,000 3. Subtotal
2,389,000 4. Adjustment for lack of marketability: 20% discount
(478,000)
5. Fair market value of Estate's undivided
interest in timber properties.
$1,911,000 His final valuation of the decedent's undivided minority interest reflects a discount of 77.74 percent from her aliquot portion of the fee value. In making his value determination, Mr. Cadenasso relied in part on certain data published in a report authored by Thomas P. Clephane. He described the data as being "gross approximations based on broad estimates of value." Mr. Cadenasso's valuation technique is similar to the technique used by *153 Charles Stark, an expert witness for the taxpayer in Harwood v. Commissioner,82 T.C. 239, 267 (1980), affd. per order (9th Cir., March 18, 1986). Mr. Cadenasso testified that prior to the trial of this matter, he discussed the Harwood case with Mr. Stark and was aware that Mr. Stark had relied, at least to some extent, on the Clephane Report. In Harwood, we found that the data relied upon by Mr. Stark was incomplete and concluded that he has not adequately substantiated his suggested discount. Nevertheless, we ultimately concluded in Harwood that the proper discount was 50 percent. Harwood v. Commissioner,supra.
Respondent urges us to disregard Mr. Cadenasso's computations in this case for the same reason, i.e., failure to substantiate the Clephane data, but we decline to do so because we are convinced his candid admissions as to the nature of the Clephane data clearly demonstrate that respondent's objections go to the weight to be accorded such data and the computations based thereon, rather than their inadmissibility. In any event, we are satisfied that a discount from the value determined by reference to the fee value is *154 warranted because of the disabilities associated with decedent's undivided interest. The disabilities include lack of marketability, lack of management, lack of general control, lack of liquidity, and potential partitionment expenses. In Harwood v. Commissioner,supra, we considered a similar issue and applied a 50 percent discount for the liquidity and marketability factors associated with a minority interest in a limited partnership engaged in the timber business. See also Estate of Andrews v. Commissioner,79 T.C. 938 (1982). [20]
From the record as a whole and particularly in view of the unanimity of the testimony of respondent's experts that a minority discount is proper in this case; the testimony by Mr. Sandberg, one of petitioner's experts, who was familiar with the Kimberly-Clark purchase of a minority *155 interest in the properties, that an appropriate discount could be as much as 60 percent; the Kimberly-Clark sale of a minority interest in the Almador tract which reflected a minority discount of 50 to 60 percent or possibly more; Mr. Cadenasso's conclusion [21] that a discount of about 78 percent is warranted from his analysis of publicly traded stocks in corporations having substantial timber holdings; and the nature, size and complexity of the assets involved as well as the number of co-owners of the jointly-held properties, we are satisfied that a minority discount of 60 percent is reasonable in this case and we so hold. Contemplation of Death
About thirty-four or thirty-five months before her death on February 10, 1978, decedent transferred a Lake Tahoe residence by gift to her granddaughter. Six months later decedent transferred bonds of about the same value to her other three grandchildren. Respondent determined that the gifts to the grandchildren *156 are includable in decedent's estate under section 2035. Section 2035 provides that the gross estate of a decedent shall include the value of all property transferred by the decedent in contemplation of death, and creates a rebuttable presumption that all transfers, without regard to size, make by the decedent within three years of death are transfers made in contemplation of death. [22]
*157 The presumption created by section 2035 is one of law, rather than fact and, as such, is not evidence. Estate of Gerard v. Commissioner,57 T.C. 749, 757 (1972). The estate or other party challenging a determination by respondent that gifts made by decedent were made in contemplation of death, has the burden of proof. Estate of Gerard v. Commissioner,supra.
The phrase "contemplation of death" was defined by the Supreme Court in United States v. Wells,283 U.S. 102, 116-117 (1931), as follows: The quality which brings the transfer within the statute is indicated by the context and manifest purpose . . . The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax . . . As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition . . . It is contemplation of death, not necessarily contemplation of imminent death, to which the statute *158 refers. [United States v. Wells,283 U.S. 102, 116-117 (1931). Citations omitted.] The ultimate test of inclusion or exclusion under section 2035 is determined by the decedent's dominant motive in making the transfers. Estate of Gerard v. Commissioner,supra at 758. Decedent's state of mind at the time of the transfers is a question of fact to be gleaned from a consideration of all facts and circumstances. In Estate of Johnson v. Commissioner,10 T.C. 680, 688 (1948), we outlined a number of elements to be considered in determining the dominant motive of a decedent in making inter vivos transfers. The list is as follows: (a) The age of the decedent at the time the transfers were made, (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a general testamentary scheme of which the transfers *159 were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making inter vivos transfers of property * * *. According to petitioner, the transfer of the Lake Tahoe residence was primarily motivated by a desire to be relieved of the responsibility of maintaining the property and by a desire to gain vicarious enjoyment through her granddaughter's use of the residence. It is undisputed that at the date of the transfer the granddaughter was in her mid-twenties, was about to be married, and was the only grandchild who did not already have access to a house at Lake Tahoe. It is also undisputed that the decedent was then 97 years of age and no longer had any need for the Tahoe *160 residence.After transferring the residence to the granddaughter the decedent transferred the bonds to the other grandchildren at the behest of one of her grandsons in order to continue her equal treatment of the grandchildren. Under these circumstances, it is apparent that the key to decedent's primary motive for all of the transfers is in the transfer of the residence to the granddaughter. If the transfer of the residence to her was made in contemplation of death so was the transfer of the bonds. From the testimony of her family it is apparent that decedent was naturally cheerful and optimistic as opposed to gloomy and pessimistic. She was both award and proud of the longevity in her family. It is also apparent that while she had been ill and hospitalized in 1973, she had recovered and was in reasonably good health for her age, according to her doctors, in March 1975 when the residence was transferred to the granddaughter and the record contains no evidence to the contrary with respect to her health in September 1975 when the bonds were transferred to the other grandchildren. It is true that she was again hospitalized in February of 1976, but her physical condition then is not *161 relevant to her mental condition in the preceding March and September. Nevertheless, she again made a complete recovery in 1976 and became socially active and able to move about freely. It seems, therefore, that respondent's primary reliance on her advanced age and physical condition to support his contention that the transfers were made in contemplation of death is misplaced. She was at the time 97, old by almost any standard, but age alone is not dispositive of the issue and a sister was then living at age 100 and continued to live to be 106. The decedent had been seriously ill two years before, but by the time of the transfers she had recovered and was walking at least one mile each day. She was also seriously ill during the year after the transfers, but she recovered again and she died almost three years after the first transfer and two and one-half years after the last transfer. What's more her death occurred from complications associated with a broken hip received in an accident and not from any of her previous illnesses. The fact that decedent had a long established practice of making gifts to her children and grandchildren is also evidence in support of petitioner's *162 assertion that the gifts in question were associated with life or living and therefore were not testamentary dispositions. Estate of Johnson v. Commissioner,10 T.C. 680, 688 (1948); Estate of Hill v. Commissioner,64 T.C. 867, 878 (1975). [23] Such a policy of gift-giving, which in her case covered at least 25 years, is indicative of a life motive on the part of the decedent. Estate of Hill v. Commissioner,supra.Although gifts were made in much larger amounts in 1953 and 1959, the majority of the transfers were made in cash on the first day of each year in amounts of $6,000 or $3,000. We are unable, however, on this record, to agree with respondent that the transfers of the bonds and the Lake Tahoe residence clearly fall outside her well-established pattern of gift-giving. Respondent also argues that the gifts to decedent's grandchildren were substitutes for testamentary dispositions which in other cases have been cited as evidence that gifts were made in contemplation *163 of death. Estate of Lowe v. Commissioner,64 T.C. 663 (1975). Her plan for testamentary dispositions appears in her will of April 17, 1972. In the original version of that will the Lake Tahoe property, as well as the bonds, were part of decedent's residuary estate which was bequeathed in trust for the Clinton Walker Foundation and her grandchildren. In the same will decedent had bequeathed to her granddaughter a sum of money equal to the value of the Lake Tahoe residence.Two days after the inter vivos transfer of the residence, decedent executed a codicil which deleted from the will the bequest to the granddaughter of the sum equal to the value of the Lake Tahoe property. Subsequently she transferred sufficient bonds to the other grandchildren to treat them equally with the granddaughter. It is true that prior to the transfers the bonds and the Lake Tahoe property would have passed to a trust of which the grandchildren were beneficiaries but not the only beneficiaries. It is also true that under the will a cash sum equal to the Lake Tahoe residence, but not the residence, was bequeathed to the granddaughter. With the transfers in 1975 the decedent, generally speaking, *164 transferred outright to the grandchildren something which they would have received at least in value and in trust under her will. However, under all the circumstances existing in 1975 we are inclined to conclude that this did not amount to a substitution of inter vivos gifts for testamentary dispositions as contended by respondent, but instead was motivated by decedent's desire to continue her long-established practice of making lifetime gifts to her grandchildren, especially since the total transfers represented less than 6 percent of her estate. [24]
We conclude, therefore, from the record as a whole that petitioner has carried its burden of proof and has rebutted the statutory presumption that the transfers were made in contemplation of death. Decision will be entered under Rule 155.
Footnotes
1. In an amended answer respondent claimed an additional deficiency of $1,937,779. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect at the time of the decedent's death, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
3. The parties have also agreed that there was a total of 387,713 million board feet of timber on the tracts in which decedent held an undivided interest. Their agreement includes the amount of timber on each tract.↩
4. The cost of the engineering and forestry work such as surveys, timber cruises, and appraisals incurred with respect to the partition was at least $925,000.↩
5. This was for 1971, the last year of the Kimberly-Clark partition.↩
6. Alma Brooks Walker survived the decedent and died in 1981 at 106. She had executed a 15-year lease at age 90 and lived to see it expire.↩
7. Respondent's initial valuation of $5,652,905 was based on the valuation report of Engineer Revenue Agent Ronald Cerruti, dated February 4, 1981, which did not include the agreed value of $6,250 for the geothermal resource.↩
8. See also Estate of Iacono v. Commissioner,T.C. Memo. 1980-520↩. 9. See also Estate of Folks v. Commissioner,T.C. Memo. 1982-43↩.
10. We also note that section 1.611-2(d)(2), Income Tax Regs.↩ provides, as to mineral properties, that "analytical appraisal methods of valuation, such as the present value method will not be used: (i) if the value of the mineral property and improvements, if any, can be determined upon the basis of cost or comparable values and replacement value of equipment; or (ii) if the fair market value can reasonably be determined by any other method."
11. We also note that petitioner's appraiser, Dean Solinsky, relied upon the 21 Walker Stumpage Sales in arriving at his prediscount values for the timber.↩
12. We note here that petitioner makes the same argument with regard to NRM's time adjustment in the Roseburg/Kimberly-Clark transaction for the 19 month period between our valuation date (February 10, 1978) and the date of the Roseburg sale (September, 1979), NRM again based its time adjustment on the 10 year average price experience data. Petitioner's expert arrived at an adjustment factor of 37.4 percent as opposed to the 34.7 percent used by NRM. For the reasons discussed above, we think that NRM's time adjustment was unreasonable and that a reduction in NRM's fair market determination for the subject properties is warranted.↩
13. We also note that Stanley Richards, one of NRM's appraisers, testified that NRM was influenced in its allocation of the $10 million to the sawmills by Glenn Zane's appraisal for Kimberly-Clark in connection with the sale. Since Zane was used as an expert by petitioner, NRM's purchase price allocation was not without foundation.↩
14. Diameter breast high.↩
15. Petitioner also objects to respondent's use of the Roseburg transaction for a land sale comparable. According to petitioner, the problem discussed hereinbefore with regard to the allocation of the purchase price between land, timber and the mills caused NRM to base its determination at least in part on an arbitrary and unsupported allocation. Although petitioner asserts that respondent failed to properly allocate the Roseburg purchase price between timber and non-timber assets, petitioner failed to come forward with any evidence that a more accurate allocation is possible. Furthermore, the purchase price allocation was based in part on an appraisal made by Glenn Zane, one of petitioner's experts, who was employed by Kimberly-Clark in connection with that sale. Petitioner also contends that the remaining sales relied upon by NRM (the Long and Laxague sales) included high quality, high value timber not present on the subject lands. While we do not disagree, petitioner has failed to produce any evidence from which we can determine that the value of this particular high quality timber resulted in a detriment to petitioner.↩
16. The tendency to do so in increased where the timber is not mature by the fact that the anticipated value due to growth represents an ever-increasing asset which is not subject to income tax unless and until the timber is cut.↩
17. Respondent's attitude toward this issue and his indifference to the assistance which the Court needed with respect thereto is difficult to understand especially in view of the additional deficiency claimed by reason of the increase in his original valuation of the undivided interest from $5,652,905 to $9,414,572 and his burden of proof under Rule 142(a).↩
18. The property was actually appraised as of May 1, 1980 at $4,250,000 for 3,030 acres or $1,403 per acre. In fact, 3,168 acres were involved in the January 3, 1978 sale producing a value of $4,444,000. ↩
19. In fact, petitioner contends that the minority discount is even greater because the 1974 appraisal was used in connection with a contested property tax proceeding and was presumably low. In addition, petitioner asserts that the $500,000 purchase price includes a premium because the sale gave the Walker family a 100 percent interest in the parcel. Petitioner correctly contends that a minority discount must be measured by the price which a hypothetical buyer, who has no existing interest in the property, would pay. Estate of Andrews v. Commissioner,79 T.C. 938, 956 (1982). See also Propstra v. United States,680 F.2d 1248 (9th Cir. 1982); Estate of Bright v. United States,658 F.2d 999↩ (5th Cir. 1981) (en banc).
20. See also Estate of Folks v. Commissioner,T.C. Memo. 1982-43↩ where we applied a 50 percent discount for lack of liquidity and an additional 50 percent discount for lack of marketability (net 75 percent discount) to a minority stock interest in a closely held family corporation engaged in the lumber business.
21. If we reduce Mr. Cadenasso's conclusion because of his reliance upon the Clephane Report by 20 percent his discount would still be over 60 percent. A reduction by one-third would leave a discount of over 50 percent.↩
22. Prior to the passage of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, and the amendment of section 2035, effective for transfers made subsequent to December 31, 1976, section 2035 provided in relevant part as follows: Sec. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death). (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and section 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
23. See also Estate of Apple v. Commissioner,T.C. Memo. 1983-422; Estate of Stowe v. Commissioner,T.C. Memo. 1972-108↩.
24. See Estate of Brownell v. Commissioner,T.C. Memo. 1982-632↩.