UNITED STATES of America,
Appellant, Cross-Appellee,

v.

100 ACRES OF LAND, MORE OR LESS,
IN MARIN COUNTY, STATE OF CAL-
IFORNIA, and Drake's Beach Estates,
Inc., a corporation, et al., Appellees,
Cross-Appellants.

Nos. 26483, 26531.

United States Court of Appeals,
Ninth Circuit.

Sept. 25, 1972.

Rehearing Denied Dec. 6, 1972.

Carl Strass (argued), Raymond N. Zagone, Kent Frizzell, Attys., Shiro Kashiwa, Asst. Atty. Gen., Washington, D. C., James L. Browning, Jr., U. S. Atty., Robert H. Hamblin, Asst. U. S. Atty., San Francisco, Cal., for appellant, cross-appellee.

Jess S. Jackson, Jr. (argued), Burlingame, Cal., Edward D. Landels (argued), Earl M. Ripley, of Landels, Ripley, Gregory & Diamond, San Francisco, Cal., Robert S. Webber, Burlingame, Cal., E. Warren McGuire, County Counsel, San Rafael, Cal., for appellees, cross-appellants.

Before BROWNING and WRIGHT, Circuit Judges, and TAYLOR*, District Judge.

FRED M. TAYLOR, District Judge.

This is a condemnation action involving a small peninsula of sandy real estate on the coast of Marin County, California, commonly known as Limantour Spit, some 45 miles north of the city of San Francisco on the Pacific Coast. Appellee (Drake's Beach) claims title through a patent of the United States to Andrew Randall issued June 4, 1860.

* Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

The Government contends that the land in question was not included in the patent. These proceedings had their inception when the United States purchased from Drake's Beach some 850 acres adjacent to this parcel of land for the Point Reyes National Seashore Project. As a part of that purchase agreement the United States agreed to institute this condemnation proceeding against the parcel in question which the United States claimed it owned. Pursuant to the condemnation proceedings, the parcel of land was taken by the Government on October 23, 1963.

The trial of the issues was bifurcated, the issue as to title was tried to the court, without a jury, and subsequent to the court's finding title in Drake's Beach, the issue of just compensation for the taking was tried to the court and a jury which lasted about 12 weeks. The jury returned a verdict for $700,000 as the just compensation which was considerably more than the Government's evidence of value and substantially less than what Drake's Beach contended it should have as just compensation.

The final judgment was entered on May 7, 1970, from which the Government appealed and Drake's Beach cross-appealed. The principal issues presented by the Government on its appeal relate to the question of title to the property being condemned and the admissibility of the evidence introduced on behalf of Drake's Beach in determining market value of the property taken. The issues raised by Drake's Beach by its cross-appeal relate to the denial of its motion for interest at the prevailing rate rather than the 6% awarded in the judgment; the denial of Drake's Beach's motion for just compensation to include expenses and disbursements necessarily incurred in defending its title, surveying and determining the size and dimensions of the land taken and establishing value; and the refusal of the trial court to promptly order an increase of the deposit from $1.00 to the amount of the judgment plus interest.

We shall first consider the issue raised in regard to title and ownership of the property condemned.

The Government concedes that Drake's Beach is the successor in interest of the patentee, Andrew Randall, and that the shore line (mean high tide line) of Tomales Bay, the Pacific Ocean and Limantour Bay constituted the northerly and westerly boundaries of the land patented. The patent was issued pursuant to a decree confirming a Mexican grant to one Antonio Maria Osio. This decree is incorporated in the patent and recites that the land title is the same as that formerly granted to Osio and is bounded on one side by the Estero of Tomales, on two sides by the Pacific Ocean, and on the fourth side by land known as the Ranches of James Richard Perry and Rafel Garcia.

Following the decree of confirmation on December 28, 1857, a survey was made of the land confirmed. The surveyor ran a meander line along the shores of Tomales Bay, Limantour Bay and the Pacific Ocean. A description of the land in accordance with this survey is included in the patent and a plat thereof attached to the patent. When the surveyor reached a point part way up the Limantour Bay side of the Spit, he made a traverse "S.17½° W. 4.50 to the mouth of Limantour's Bay. Thence along the rocky coast of the Pacific Ocean". This line has been referred to in these proceedings as "the 415 line". The effect of this course No. 415 was that the balance of the Spit lay outside the traverse lines constituting the courses and distances of the meander line and this is what gave rise to this controversy.

On this appeal the Government concedes that the lines drawn by the surveyor were meander lines along the shores of Limantour Bay and the Pacific Ocean and that under well established principles, the actual shore line and not the traverse lines of the survey consti-

tutes the boundary of the land patented.[1] Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891); Thomas B. Bishop Co. v. Santa Barbara County, 96 F.2d 198 (9th Cir. 1938), cert. den. 305 U.S. 623, 59 S.Ct. 84, 83 L.Ed. 398 (1938).

The Government concedes that if the portion of the Spit in question was at the time of the survey and patent a continuation of the peninsula lying above mean high tide, then Drake's Beach owns it, but if below mean high tide, then it was an island and not within the survey and patent.

In regard to the question of title to that portion of the Spit, the only issue to be resolved by this court is whether the findings of the trial court are supported by the evidence. The trial court found as follows:

"10. The ordinary high tide lines of Limantour Bay and the Pacific Ocean as they existed at the time of the survey and patent forming the boundaries of Limantour Spit are depicted on the U.S. Coast Survey Map between Duxbury Reef and Rancho Punta de los Reyes, 1859–60, Register 805 (Plaintiff's Exhibit 28) and on U.S. Coast Survey Map entitled 'Preliminary Chart of Drake's Bay, California' dated 1860 (Plaintiff's Exhibit 29), and at the time of the survey and patent Limantour Spit extended above ordinary high tide for approximately one and one-third miles westerly of the traverse line between Stations 415 and 416 as said line is shown by said survey."

"11. The location of the mouth of Limantour Bay at the time of the survey and patent is depicted on said U. S. Coast Survey Map dated 1859–60 (Plaintiff's Exhibit 28) and on said 'Preliminary Chart of Drake's Bay' dated 1860 (Plaintiff's Exhibit 29) and was in fact approximately one and one-third miles westerly of the traverse line between stations number 415 and 416 in the survey and lay opposite the middle bluff of Drake's Head."

"12. There is no evidence that at the time of the survey or patent islands of land surrounded by water at mean high tide existed in the area of Limantour Spit or that a channel of water at mean high tide existed at or near the traverse line between stations numbered 415 and 416 on the survey."

"13. At the time of the issuance of the patent to Andrew Randall, Limantour Spit, of which the property involved in this action was a part, was a long narrow peninsula extending westerly from the upland and lying above mean high tide for its entire length."

In determining the question of title to the parcel of land in question,

---

1. The Government says "It is undisputed that the actual mean high tide line is the boundary if there were a difference between the survey meander line and the actual mean high tide line". At the same time, however, the Government cites certain cases for the rule that an erroneous meander line is effective to limit the scope of the land granted. The cases in this area were dispositively reviewed by the Supreme Court in Producer's Oil Co. v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330 (1915) (see authorities collected, id. at 338–339, 35 S. Ct. 755). The Court held that its prior cases established that a meander line does not delimit a grant where the land is bordered by water *unless* special evidence is presented to show an intent to use the meander line as a boundary of the patented land. *Id.* at 339, 35 S.Ct. 755. Accord, Thomas B. Bishop Co. v. Santa Barbara County, 96 F.2d 198, 202 (9th Cir. 1938), cert. denied 305 U.S. 623, 59 S.Ct. 84, 83 L.Ed. 398 (1938). Both Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68 (1895) and Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171 (1899), cited by the Government, are "special facts" cases. See *Horne,* supra, 159 U.S. at 43–46, 15 S.Ct. 988 ("obvious" that survey not intended to cover the disputed parcel), and *Niles,* supra, 159 U.S. at 306–309, 20 S.Ct. 124 (meander line intended to serve as boundary line of fractional shares in the grant). The present case does not involve a special intent to limit the survey.

the crucial issue before the court is whether the low lying Limantour Spit was above the mean high tide line in 1858, the time of the survey on which the patent was based. It appears to be the Government's theory that in 1858, although Limantour Spit may have existed at low tide, it was only two islands at mean high tide and therefore the patent only granted to Randall the land to the seashore and the islands remained the property of the United States. Drake's Beach contends, and the trial court found, that the entire spit existed above the mean high tide line in 1858.

We have carefully considered the evidence in the record on which the respective parties rely, both documentary and otherwise, in regard to the title issue and believe there is ample evidence to support the findings and conclusions of the trial court on this issue. Certainly the findings and conclusions are not clearly erroneous.

Having resolved the question of title, we now turn to the evidentiary issues raised by the Government. The precise questions presented here are whether the trial court abused its discretion in allowing Drake's Beach to introduce evidence of lot sales and development costs in support of its "developer's residual approach" theory for the purpose of determining the fair market value of the property taken; and whether the court erred when it admitted evidence as to probabilities of integrated use of the condemned land with state-owned tidelands.

This court in United States v. 55.22 Acres of Land, etc., Yakima County, Wash., 411 F.2d 432, 434 (9th Cir. 1969) announced the rule in regard to the admissibility of evidence as follows:

"The determination of that question [referring to the admissibility of evidence] calls for an exercise of a sound discretion by the trial court, and the ruling thereon is reviewable only for abuse of discretion.

In a condemnation proceeding, such as we have here, the desired result is to see that the landowner is put in as good a position pecuniarily as he would have occupied if his property had not been taken. Seaboard Airline Ry. Co. v. United States, 261 U.S. 299, 304, 43 S. Ct. 354, 67 L.Ed. 664 (1923). The Supreme Court of the United States has laid down broad guidelines for the purpose of achieving this desired result. In United States v. Miller, 317 U.S. 369, 373, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943), the Court stated:

"It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the . . . 'fair market value' of what is taken."

The three generally recognized approaches in ascertaining "fair market value" are: (1) Comparable sales; (2) the income or capitalization of income; and (3) the reproduction cost at the time of taking, less depreciation. See United States v. Toronto, Hamilton and Buffalo Nav. Co., 338 U.S. 396, 402, 403, 70 S.Ct. 217, 94 L.Ed. 195 (1949).

Ordinarily, if there are sales of comparable property at or near the time the condemned property is taken, evidence in regard to such sales would be more appropriate than any other method in determining the market value of the property taken. However, if there are no comparable sales, then other methods must be resorted to in order to ascertain market value. In order for the sales of other property to be admissible and relevant, that property must be in fact comparable. See Fairfield Gardens, Inc. v. United States, 306 F.2d 167, 172 (9th Cir. 1962).

The land or sandspit, the subject of this action, was a portion of some 1000 acres of property owned by Drake's Beach. Easterly of the subject property

was another 100 acres of the same sand-spit which had been acquired by the Government as part of an earlier settlement. The property in question was part of a recreational and residential development in progress on the entire acreage. Development of the condemned property was imminent. Indeed, some preparatory physical work had already been completed.

■ At trial, Drake's Beach, through its expert appraiser witnesses, asserted that the highest and best use of the subject property was for subdividing into recreational beach lots, while the Government, through its appraisers, maintained that the highest and best use of the property was for recreational purposes only. It is not uncommon for expert witnesses to disagree in regard to the highest and best use to which condemned property may be put and as to values based on their respective opinions. Ultimately, this is a question to be decided by the trier of fact, in this case the jury, from the evidence. It appears obvious that the jury in this case agreed with the landowner. It is basic, not disputed by the Government here, that in an eminent domain proceeding the landowner is entitled to a value based on the use to which the condemned property is being put or may be put in the reasonably near future. Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); McCandless v. United States, 298 U.S. 342, 345, 56 S.Ct. 764, 80 L.Ed. 1205 (1936).

The expert witnesses for Drake's Beach testified as to the fair market value of the condemned property to be $1,600,000 and $1,995,000 and the Government's witnesses valued the land at $171,000 and $185,000. In arriving at their values, the owner's witnesses took into consideration the market data of sales of adjacent subdivided lots and made deductions for selling and advertising expenses, engineering and development costs, overhead costs, taxes, buyers' anticipated profits, and for acreage loss for streets, etc. in order to reflect or indicate the value of the property at the time of taking. In this case, the data relied on was derived from the market and facts as had been generated in the development of adjacent land. This method is referred to as the "developer's residual approach".

The Government's values were based on what its witnesses considered comparable sales. The record does not show that the sales relied on were in fact comparable in regard to location, character and desirability for subdividing as recreational property. It is apparent that the jury was not impressed.

■ The Government strenuously objected to the owner's method of arriving at the fair market value of the condemned property and argues here that the trial court erred in admitting such evidence. It is claimed that the method is speculative in the extreme and has no relation to the market because it does not consider the seller or competing investment opportunities. We do not agree. The evidence admitted was based on facts obtained as a result of the subdivision of which the condemned property was a part and partially under development at the time it was taken. Even though the subject property was largely unimproved, it was an integral part of a subdivision being developed and was the next unit to be completed. It did not exist as a separate parcel prior to the commencement of the condemnation action. The record clearly indicates that the subject property was unusual in character in that it was a sandspit surrounded on three sides by water and had good potential for development as beach homesites.

It is fundamental that Drake's Beach is entitled to just compensation for the subject property and this requires that it be placed in "as good a position pecuniarily" as it would have occupied if its property had not been taken. See United States v. Miller, supra; Seaboard Airline Ry. Co. v. United States, supra.

This court enunciated the rule in U.S. v. 55.22 Acres, supra, that various appraisal methods are admissible for de-

termining just compensation or market value. All facts which would influence a person of ordinary prudence, desiring to purchase the property, are admissible. Kimball Laundry Co. v. United States, 338 U.S. 1, 16, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). The modern trend favors a broad rule of admissibility, with discretion in the trial court. United States v. 25.406 Acres of Land, et al., 172 F.2d 990, 993 (4th Cir. 1949), cert. denied 337 U.S. 931, 69 S.Ct. 1496, 93 L.Ed. 1738 (1949); and any evidence is admissible which might reasonably influence a willing seller and a willing buyer. Wolff v. Commonwealth of Puerto Rico, 341 F.2d 945, 947, 948 (1st Cir. 1965).

■ It is fair to say that the valuation trial was unusual, not only as to the characteristics of the subject property, but also in regard to the volume of evidence produced and time consumed in presenting it to the jury. Each party was given every opportunity to present evidence on its theory as to value and to counter or refute the evidence and theory of the other. After carefully reviewing the record and prevailing authorities, we conclude that the trial court did not abuse its discretion in admitting the evidence of appellee, Drake's Beach, on the question of fair market value. The trial court correctly instructed the jury during the trial that the amount to be awarded was the fair market value of the property as it was on October 23, 1963, the date it was taken by the Government.

In performing this difficult task, the jury was entitled to and apparently did take into consideration all the evidence introduced by the respective parties in arriving at its verdict.

The remaining evidentiary question raised by the Government is that the trial court erred in permitting Drake's Beach to present testimony as to the reasonable probability that adjoining state-owned tidelands would have been available in connection with the development of the subject property. One probable use was to straighten the common boundary line and the other was to provide a source of land fill for the condemned property while dredging of the State's channels for recreational boatways. At trial, the Government objected to the introduction of this evidence and to the court's charge permitting the approach.

Drake's Beach contends that this evidence of reasonable probabilities was admissible on several grounds: (1) Relevant to market value as a factor an informed buyer and seller would consider; (2) relevant to adaptability of the property to its highest and best use; and (3) relevant to the feasibility of such use. The Government argues that in a federal eminent domain proceeding, a condemnee cannot assume assemblage with lands of another sovereign whose policy parallels the federal one and prohibits the contemplated use. In this connection, the Government argues that the State lands were held for a purpose parallel to the federal purpose, which was a park to preserve its natural attributes; that the State lands were in or adjoined clam and oyster preserves and therefore involved State policy on ecology; and that the State fully supported the federal purpose and had objected in the past to just the kind of use proposed for these particular State holdings because such use would adversely affect the ecology of the clams and oysters.

■ It appears to be well settled that in determining market value of condemned property, evidence as to the reasonable probabilities of its use is admissible and may be considered. See McCandless v. United States, supra; United States v. Waterhouse, 132 F.2d 699 (9th Cir. 1943), aff'd. 321 U.S. 743, 64 S.Ct. 484, 88 L.Ed. 1047 (1944). The weight to be given evidence of reasonable probability is a question for the trier of fact. Cf. Olson v. United States, supra. Evidence in regard to prospective uses is admissible and whether adaptability and probability affect mar-

ket value is for the jury. United States v. Waterhouse, supra.

■ The argument of the Government on this question seems to be based on what the State's policy was subsequent to the initiation of the Government's project, while the evidence was introduced to show probabilities that may have been prior thereto. It is fundamental that the effects of a project, which requires the taking of property, must be disregarded in determining the fair market value of the property prior to the taking. See Olson v. United States, supra; New York v. Sage, 239 U.S. 57, 36 S.Ct. 25, 60 L.Ed. 143 (1915). This evidence was introduced by Drake's Beach through witnesses who expressed their opinion and the facts and reasons on which such opinions were based. The Government had ample opportunity to cross-examine these witnesses and to discredit or contradict the testimony of Mr. Mady and others. The trial court, in its discretion, properly decided the witnesses were competent to testify and apparently found that a sufficient foundation had been shown for such testimony. The weight to be given such opinion evidence in the circumstances was for the jury.

■ The competency of an expert witness is a matter for the trial judge in the exercise of discretion. In St. Joe Paper Co. v. United States, 155 F.2d 93 (5th Cir. 1946), at page 96, the court stated:

"The qualifications required of an expert before he may give an opinion is a question for the trial judge and his decision thereon is conclusive, unless clearly erroneous as a matter of law."

■ We conclude that the admission by the trial court of the evidence complained of by the Government does not constitute reversible error.

## CROSS-APPEAL

On November 28, 1969, the jury rendered its verdict in favor of Drake's Beach for the sum of $700,000 as the just compensation for the condemned land. Thereafter, Drake's Beach moved the trial court to award interest at the prevailing economic rate; for additional compensation by way of litigation expenses and disbursements in excess of $150,501.88; and to increase the security deposit and for payment of the same. The motions were denied and Drake's Beach cross-appealed, limiting its appeal to the denial of its motions.

Drake's Beach contends that the Fifth Amendment to the Constitution and the decisions of the Supreme Court of the United States require that the landowner in a federal eminent domain proceeding be fully compensated for his losses and that an additional element of his loss is the right to a reasonable rate of interest for the delay in payment. Drake's Beach argues that the allowance of six percent interest, as authorized by 40 U.S.C. § 258a and as provided in the judgment, is not a reasonable rate of interest because it was not the current prevailing economic rate and therefore would not fully compensate Drake's Beach for its loss.

The question of a rate of interest higher than the six percent authorized by 40 U.S.C. § 258a was initially raised by Drake's Beach in the form of a lodged Judgment, requesting that the interest be computed at the prevailing economic rate. The Government opposed awarding interest at a rate in excess of that provided by statute. The trial court denied the motion of Drake's Beach as to interest, but stated that it would have provided a rate of seven percent but for the statute requiring six percent.

In Monongahela Navigation Co. v. United States, 148 U.S. 312, 327, 13 S. Ct. 622, 626, 37 L.Ed. 463 (1893), it is clearly stated that the determination of just compensation is a judicial question:

". . . this is a judicial, and not a legislative, question. The legislature may determine what private property

is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry."

United States v. Miller, supra, teaches that a landowner is to be made whole for his losses resulting from the government's taking of his property. In Seaboard Airline Ry. Co. v. United States, supra, the Supreme Court stated 261 U. S. 299, at page 306, 43 S.Ct. 354, at page 356:

"The requirement that 'just compensation' shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation. *Where the United States condemns and takes possession of land before ascertaining or paying compensation, the owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added.*" [emphasis added]

It is evident from the language used in 40 U.S.C. § 258a that interest is intended to be a part of just compensation:

" . . . said compensation shall be ascertained and awarded in said proceeding and established by judgment therein, and the *said judgment shall include, as part of the just compensa-*

*tion awarded, interest* at the rate of 6 per centum per annum . . ."

[emphasis added]

 This court is of the opinion that interest, at a proper and reasonable rate, is an element of the just compensation to be determined in the judicial process. Since we believe interest is an element of just compensation, we must consider whether interest is a question of law to be decided by the court, or if it is a question of fact to be determined by the trier of fact. In a complex capitalist society such as ours, a determination as to what is a proper rate of interest has many variables based on economic and business considerations which may vary within each factual situation. It seems clear that a determination as to the proper rate of interest is a factual question and should be determined by the trier of fact.

The record in the present case conclusively shows that Drake's Beach did not attempt to introduce any evidence in regard to interest during the valuation trial. It was not until after the jury had found just compensation that Drake's Beach raised the issue of interest. In Confederated Salish and Kootenai Tribes v. United States, 437 F.2d 458 (1971), the United States Court of Claims was presented with a similar problem. The case was originally tried before a Commissioner and although the claim for a higher rate of interest was presented to the Commissioner, there was no attempt to present evidence in support of the claim until it was presented to the United States Court of Claims. The court, in discussing the question of interest, stated at page 460:

"We think that an issue of this character should have been threshed out at the trial, where both sides could have introduced evidence (and possibly expert testimony, subject to cross-examination) and an adequate record made for the court's guidance . . ."

The quoted rationale is equally appropriate in the case here. In the above cited case, a commissioner made the determination of just compensation, while in this case the determination was made by the jury. Drake's Beach should have made the interest question an issue at trial instead of waiting until after the just compensation question had been decided by the jury. Drake's Beach had its day in court to prove just compensation and to present all its evidence affecting that determination. It is not entitled to another trial to prove additional elements of just compensation which it could have presented during the original trial.

Drake's Beach further contends that the trial court should have also awarded, as just compensation, its expenses and disbursements incurred in this litigation. This question was also raised subsequent to the jury verdict. We believe this question was resolved in Dohany v. Rogers, 281 U.S. 362, 368, 50 S.Ct. 299, 302, 74 L.Ed. 904 (1930), wherein it is stated:

"Attorneys' fees and expenses are not embraced within just compensation for land taken by eminent domain."

Without reliance on *Dohany,* we do not consider it necessary to discuss the merits of this contention since the record reveals that there was no attempt to present evidence to the jury in regard to litigation expenses. If, as Drake's Beach contends, litigation expenses are a part of the just compensation to be awarded, it follows that evidence in regard to such expenses should have been presented to the trier of fact.

The final question raised on this cross-appeal is now moot since this court has heretofore ordered the Government to make an adequate deposit and for the withdrawal of the same by Drake's Beach.

The judgment made and entered in this cause is affirmed.