UNITED STATES of America,
Plaintiff–Appellant,

v.

22.80 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF SAN BENITO, STATE OF CALIFORNIA, et al., Defendants–Appellees.

No. 86–15027.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1987.

Decided Feb. 23, 1988.

Laura Frossard, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Pettit & Martin, Robert L. Maines, David W. Slaby and Thomas H. Squeri, San Jose, Cal., for defendants-appellees.

Before WALLACE and POOLE, Circuit Judges, and KEEP,* District Judge.

KEEP, District Judge:

By this appeal, the government challenges the amount of compensation awarded to landowners in an eminent domain proceeding. The district court found that the fair market value of the rock taken from appellee's property was $.60 per ton for the limestone and $.25 per ton for the decomposed granite. Based upon the undisputed quantities actually removed by the government, the court entered judgment for the landowners in the amount of $642,-954.50. The government maintains that the district court erred in valuing the rock taken by using an estimated future income method without capitalizing or discounting the income to present value. The government also argues that the evidence of market demand for the decomposed granite was insufficient to support the award of just compensation based upon estimated future income.

* Honorable Judith N. Keep, United States District Judge, Southern District of California, sitting by designation.

District court jurisdiction for the condemnation proceeding exists pursuant to 28 U.S.C. § 1358. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## BACKGROUND

The property at issue in this case is the Pearce Quarry, which is located approximately five miles southwest of the town of San Juan Bautista in San Benito County, California. The Quarry was operated from 1926 to 1973 by the Ideal Cement Company pursuant to a lease; Ideal Cement quarried and processed limestone for the manufacture of Portland cement in return for a royalty paid to the landowners on each ton of limestone extracted. Ideal Cement closed its cement plant and ceased its quarry operations in 1973 due to air pollution problems. The Quarry remained closed after that time, although it contained substantial deposits of limestone and decomposed granite.

In July 1984 the United States Bureau of Reclamation made an offer to purchase an estimated 500,000 tons of limestone and 700,000 tons of decomposed granite from the Quarry to be used as construction aggregate for the nearby San Justo Dam and Reservoir Project. The government's original offer of $605,000, based on an appraisal by Robert Grijalva, was withdrawn after the Denver office of the Bureau rejected this appraisal. The government's subsequent appraisal and offer was for $65,000. When the landowners rejected this reduced offer, the government filed a Declaration of Taking and a Complaint in Condemnation.

The district court heard testimony from six expert witnesses, including three for the government and three for the landowners, who gave their opinions on the fair market value of the rock taken. These experts testified as to the local market for rock production, the economic feasibility of

rock excavation, and the appropriate royalty rate. Using various appraisal methodologies, the witnesses arrived at widely varying estimates for the value of the removed material, ranging from worthless to nearly $643,000.

It is uncontroverted that the highest and best use of the Quarry is for gravel excavation. In fact, the landowners have apparently entered into a new lease agreement for an excavation operation with Hillsdale Rock Company, which became effective upon completion of the government's taking. The real dispute in this case concerns the amount of the condemnation award. Essentially, there are two issues before the court: (1) whether the district court erred in adopting the valuation methodology advocated by the landowners' chief appraisal expert without including a capitalization factor; and (2) whether there is sufficient evidence in the record to support the district court's implicit finding that there was an available market for the decomposed granite extracted by the government.

## DISCUSSION

### I. The Standard of Review

The district court's findings of fact are reviewable under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *LaDuke v. Nelson*, 762 F.2d 1318, 1321 (9th Cir.1985).

### II. The Appraisal Methodology

■ The government's first contention on appeal is that the landowners' "market data" or "comparable sales" valuation methodology (the average royalty rate per ton of material being provided in the general vicinity of the Quarry multiplied by the number of tons removed by the government) is fatally flawed because it does not include a capitalization factor to discount the lump sum payment of a stream of expected future income to its present value and to reflect the risk that this projected future income might not materialize.[1]

---

1. Because there was no available evidence of comparable, one-time sales of large quantities of rock, a strict "comparable sales" or "market data" approach was not utilized by the landowners' appraisal experts. Rather, these witnesses relied upon the average royalty rate per

ton of comparable material being paid on mineral leases in the area. This deviation from a straight "comparable sales" methodology is the basis for the government's contention that the expected income stream should be discounted to present value. The government would appar-

A number of courts have recognized that utilization of the "capitalization of income" method to value property taken under the government's powers of eminent domain may be appropriate under certain circumstances, particularly where the condemned property contains "in place" minerals.[2] However, none of these cases provide support for the government's proposition that this method is mandated as a matter of law in the instant situation. The government's reliance on *United States v. Whitehurst,* 337 F.2d 765 (4th Cir.1964) and *Foster v. United States,* 2 Cl.Ct. 426 (1983) in arguing that an appraiser *must* discount or capitalize expected income from mineral deposits taken by the government, is misplaced. In *Whitehurst,* the court acknowledged the legitimacy of the "capitalization of income" method in some circumstances, but rejected its use under the particular facts of that case because the appraisal witness had relied upon "pure speculation." 337 F.2d at 774–76. Similarly, in *Foster,* the court found that although one appraiser's use of the "capitalization of income" approach made "an interesting mathematical exercise," application of the methodology in that case was defective. 2 Cl.Ct. at 455.

■ While both the "comparable sales" and the "capitalization of income" approaches advanced in this case are among the appraisal methodologies generally recognized by the Ninth Circuit as valid, the former technique is usually considered most appropriate. *United States v. 100 Acres of Land,* 468 F.2d 1261, 1265 (9th Cir.1972). However, where there are no strictly comparable sales, the court must resort to other methods. *Id.* Here, where there were no comparable one-time sales, one possible alternative method was to extrapolate from the royalty rate being paid in the area. Such an approach previously has been utilized in this circuit. *See United States v. 237,500 Acres of Land,* 236 F.Supp. 44 (S.D.Cal.1964), *aff'd in relevant part, United States v. American Pumice Co.,* 404 F.2d 336 (9th Cir.1968).

Whether or not it was then appropriate to discount the value obtained through this modified "comparable sales" approach was a determination for the trial judge to make based upon the evidence before him. Of the six witnesses who testified as to the appraised value of the limestone and decomposed granite, only appellant's expert Paschall discounted the amount of the royalty income. Appellee's experts disagreed with this methodology. For example, Alderman testified that a discount factor was inappropriate in determining the market value of a given quantity of limestone removed from the ground. Grijalva and Gray testified that the proper way to value

---

ently concede that if the per ton value were based upon a large, one-time sale, discounting would be inappropriate. It argues that because the comparable per ton value in this case was derived instead from local royalty rates paid pursuant to ongoing mineral leases which produce income for landowners over a number of years, a strict comparability analysis requires that the lump sum payment by the government be discounted over the number of expected years it would take an operator at the Pearce Quarry to produce and sell this large quantity of material.

However, appellant concedes the government extracted the limestone and decomposed granite as one lump sum in a single, large-scale operation, not over a number of years as a lessee would do. Assuming that the district court did not err in finding the existence of a market for this material, *see infra* § III, the government offers no persuasive policy reason for not compensating the landowners at the going market rate. For example, the government does not point to any evidence which suggests that the price per ton paid by buyers of large quantities would be lower than that paid under a longer term lease arrangement. Thus, there appears to be no particularly compelling reason for requiring that the lessee analogy be carried to its logical conclusion.

2. It should be noted that this case is not strictly analogous to those situations where the government has taken *land* on which mineral resources are incidentally located. *See, e.g., United States v. 103.38 Acres of Land,* 660 F.2d 208, 212 (6th Cir.1981) (valuing coal deposit located on property condemned for a flood control project). Here, the government is taking the limestone and granite itself, not the overlying parcel of land. Appellant's argument that compensation for this material should be discounted to account for the speculative nature of its future extraction is less compelling in this case, where the government is taking resources from a previously exploited commercial quarry operation.

a fixed quantity of limestone removed from the ground is to multiply the quantity taken by the fair market royalty rate, without discounting. This court will not reweigh the evidence nor reassess the credibility of witnesses. *See United States v. 429.59 Acres of Land,* 612 F.2d 459, 462 (9th Cir. 1980).

In construing the constitutional requirements of the Takings Clause, U.S. Const. Amend. V, the Supreme Court "has been careful not to reduce the concept of 'just compensation' to a formula." *United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949). In *United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943), the court stated:

> It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose.

Further, the court noted that in determining what fair market value constitutes just compensation, "courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings." *Id.* at 375, 63 S.Ct. at 281.

■ This broad language has been interpreted by lower courts to mean that "the law is not wedded to any particular formula or method in determining fair market value as the measure of just compensation." *Sill Corp. v. United States,* 343 F.2d 411, 416 (10th Cir.), *cert. denied,* 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965); *see also Snowbank Enterprises, Inc. v. United States,* 6 Cl.Ct. 476, 486 (1984); *United States v. 3,698.63 Acres of Land,* 416 F.2d 65, 68 (8th Cir.1969). In accordance with these courts, we hold that the trial court was not restricted to a particular method in arriving at the fair market value for the condemned material. Its goal is to assure that the landowners are restored to the pecuniary position they would have occupied had the property not been taken. *United States v. 100 Acres of Land, supra,* 468 F.2d at 1265. The district court's determination of which valuation methodology would best achieve this goal is one of

fact and we conclude that its reliance upon the testimony of the landowners' expert witnesses in making this determination was not clearly erroneous.

### III. *The Sufficiency of Evidence*

The government also contends that there was insufficient evidence to support the district court's implicit finding that there was an available market for all 804,650 tons of decomposed granite which was taken by the government and for which the district court awarded compensation. Essentially, the government argues that it presented overwhelming evidence that there was virtually no market for such material and that, therefore, the district court erred in awarding compensation for all of the decomposed granite based on a per ton royalty rate.

■ While the evidence on the record before this court is both somewhat speculative and conflicting, we cannot say that it is insufficient to support the district court's finding of a viable market for decomposed granite. Some speculation is inherent in any valuation of resource property. *United States v. Silver Queen Mining Co.,* 285 F.2d 506, 510 (10th Cir.1960). Here, three witnesses testified that a market for the decomposed granite probably existed. From the record we find that these experts made "a careful inquiry into the facts" and "a reasonable estimate of the market value of the subject property after examining all the relevant facts." *United States v. 429.-59 Acres of Land, supra,* 612 F.2d at 462. It was properly the district court's function to assess the credibility of the witnesses before it. *Id.* We conclude, therefore, that the district court's finding of sufficient market demand for decomposed granite was not clearly erroneous.

Accordingly, the judgment of the district court is AFFIRMED.