UNITED STATES of America,
Plaintiff–Appellee,

v.

**99.66 ACRES OF LAND, Defendant,**

and

**Stewart Title & Trust Co., of Tucson, as Trustee under Trust No. 3267; Sunburst Investments, Inc., an Arizona Corporation, beneficiary of Title Insurance of Minnesota Trust No. 10,599, Defendants–Appellants.**

UNITED STATES of America,
Plaintiff–Appellee,

v.

**99.66 ACRES OF LAND, MORE OR LESS, IN THE COUNTY OF PIMA, STATE OF ARIZONA; Title Insurance Co. of Minnesota, a Minnesota corporation, as Trustee under Trust No. 10,599, and unknown owners, Defendants,**

and

**Southern Leasing Co., Defendant–Appellant.**

**Nos. 90–16464, 90–16699.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1992.

Decided July 23, 1992.

[redacted]

Joseph L. Esposito, Smitherman & Esposito, Tucson, Ariz., for defendants-appellants Sunburst Investments, Inc., and Stewart Title & Trust Co.

Gerard Anderson, Tucson, Ariz., for defendant-appellant Southern Leasing.

Richard B. Stewart, U.S. Dept. of Justice, Washington, D.C.; Don B. Overall, Asst. U.S. Atty., Tucson, Ariz., Michael K. Baker, Robert L. Klarquist, Ellend J. Durkee, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

[redacted]

Before: HALL and WIGGINS, Circuit Judges, and KEEP, Chief District Judge.*

KEEP, Chief District Judge:

Defendants/Appellants Stewart Title & Trust Co. and Sunburst Investments, Incorporated, the respective titleholder and beneficial owner of land involved in this suit, appeal the judgment in an eminent domain proceeding, contending that the district court erred in excluding valuation and damages testimony and also erred in denying their motion for a new trial. Appellant Southern Leasing appeals an order requiring it to pay restitution of the amount by which the government's pre-paid estimated compensation to the parties exceeded the jury award. Jurisdiction in the district court was properly established under 28 U.S.C. § 1345. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291.

## BACKGROUND

Appellant Sunburst Investments, Inc., is run by its sole employee Lowell F. Johnson, a Tucson–area real estate developer. In late 1984, Johnson began negotiating for the purchase of an approximately 360–acre tract of land known as San Joaquin Estates for development as a mobile home park. During the negotiations, Johnson learned that the Bureau of Reclamation had proposed a route for a large-scale federal water project through San Joaquin Estates. Nevertheless, Johnson and another investor [1] signed a one-year option agreement on the property for $160,000.

Johnson contacted the Bureau of Reclamation several times in early 1985, allegedly seeking information about the water project. According to the testimony presented by the Bureau, Johnson held himself out as the owner of San Joaquin estates, and sought to negotiate the sale of the portion of the tract within the proposed project route. After learning that Johnson did not yet own the property, the Bureau communicated exclusively with owner Stephen Peskoff regarding its acquisition.

When Johnson attempted to exercise his option on the property, Peskoff refused Johnson's tender of the balance of the purchase price. Johnson sued to enforce the contract, and in October, 1986, the parties stipulated to a sale of the property for a total of $1,400,000.00.

After purchase, Johnson began to develop portions of the tract not within the proposed route. Subdivision zoning was guaranteed, as the land had been formally platted into one-acre lots since 1976. The preparations included engineering plans for streets and utilities, a contract with a utili-

* The Honorable Judith Nelson Keep, Chief United States District Judge for the Southern District of California, sitting by designation.

1. The other investor, Kent Wonders, later sold his interest to Gregory Siefert, who was one of the owners at the time of taking.

ty provider, and some construction of a drainage canal. Utilities were not installed, nor were there paved streets or lot sales. Two lots had been "reserved" but were not sold at the time of taking.

On July 7, 1987, six months after Johnson purchased the San Joaquin tract, the United States filed suit to condemn a 99.66 acre swath across the tract. At that time, title was held in trust for beneficiaries Sunburst Investments (Johnson's company) and Gregory Siefert. Southern Leasing Corporation held a note from the owners secured by a deed of trust on the property. The government did not name Southern Leasing as a defendant in the complaint.

The government deposited $1 million with the district court, pursuant to 40 U.S.C.A. § 258a (West 1988), which allows the government to take immediate possession of the property upon deposit of a reasonable estimate of value with the court. After the government deposited the funds, lienholder Southern Leasing contracted with the beneficial owners and the trustee to release its lien on the property in exchange for an assignment of the present and future proceeds of condemnation awards and a beneficial interest in the trust. Four days later, the former beneficiaries petitioned for withdrawal of the deposit. The $1 million was distributed pursuant to Federal Rule Civil Procedure 71A(j) to co-owners at the time of taking Sunburst, Gregory Siefert, and trustee Executive Title Company. Of the $1 million, the payees gave Southern Leasing $963,-000.00 in accordance with their agreement.

The district court made several pre-trial evidentiary rulings. First, the court ruled that evidence of fair market value that was based on the "lot method," also known as the "developer's residual approach," would not be admitted because the proffered evidence was too speculative given the scant development of the tract. The effect of the ruling was to prevent Johnson from offering the opinion testimony of his appraiser Alfred Benson that the property was worth $2,765,000.00, since Benson based his opinion on the lot valuation approach.

Second, the trial court ruled that it would exclude evidence of severance damages for harm to the property occurring prior to Johnson's purchase. Johnson alleges that the Government's negotiations with Peskoff caused the litigation which delayed Johnson's acquisition of title and prohibited Johnson from developing the property. Third, the trial court ruled that it would exclude evidence of after-taking lot sales introduced in support of lot sale valuation. Some evidence relating to both severance and lot sales was introduced at trial nevertheless, as is discussed below.

During the trial, the court precluded Johnson's accountant from testimony as to the value of the land because he did not qualify as an expert and his information was not independent of that provided by Johnson, and was therefore not probative. Silcox used the lot method to determine value.

At trial, real estate appraiser Robert Dietrich testified on behalf of Johnson that just compensation would be $2,490,000.00, Johnson testified to his experience as a successful subdivision developer and presented his own and other lay testimony as to market demand for mobile home lots, and offered his opinion that just compensation was $2,500,000.00. His credibility was impeached with a 1980 mail fraud conviction.

Two government appraisers used comparable sales of large tracts of platted land, including the sale of the subject property six months before the taking for $1.4 million, to determine fair market value. Based on these calculations, and based on an assessment that the market was not ready to absorb all of the individual mobile home lots immediately, the government's experts arrived at compensation figures of $624,000.00 and $713,000.00.

After the jury awarded $713,000.00 Johnson moved for a new trial, arguing that the lot method evidence was excluded in error. The district court denied the motion. The final judgment required Siefert, Sunburst, Executive Title, Southern Leasing, and other distributees to reimburse the government $287,000.00, the amount by which the

estimated compensation exceeded the actual award. Southern Leasing filed an objection to its inclusion in the repayment order and moved for relief from judgment. The district court denied the motion and declined to amend the order to exclude Southern Leasing.

## QUESTIONS FOR REVIEW

The following issues are presented for review:

(1) Did the trial court abuse its discretion in excluding the landowner's valuation testimony based on the "lot method" or "developer's residual approach," which it held too speculative given the facts of the case, and in ruling that it would exclude testimony regarding severance damages that occurred before the landowner purchased the property and lot sales that occurred after the taking?

(2) Did the trial court abuse its discretion in denying appellant's motion for a new trial based on the exclusion of the valuation testimony?

(3) Did the district court err by naming lien-holder Southern Leasing in the order requiring restitution of the government's overpayment?

## DISCUSSION

### I. *Evidentiary Rulings*

■ We review the district court's evidentiary rulings in a condemnation proceeding for abuse of discretion. *United States v. 57.09 Acres of Land*, 757 F.2d 1025, 1027 (9th Cir.1985) (admissibility of evidence); *United States v. 100 Acres of Land*, 468 F.2d 1261, 1268 (9th Cir.1972) (competency of an expert), *cert. denied*, 414 U.S. 822, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973).

### A. Lot Method Testimony

This circuit generally recognizes three appraisal methodologies in ascertaining fair market value: "(1) Comparable sales; (2) the income or capitalization of income; and (3) the reproduction cost at the time of taking, less depreciation." *100 Acres of Land*, 468 F.2d at 1265. Courts occasionally allow valuation testimony on a fourth method, called either the lot method or the developer's residual approach. An appraiser using the lot method estimates a sale price for each individual, developed lot, multiplies that price by the number of lots in the tract, then deducts estimated costs of development and marketing. The sales price total is also adjusted downward, or discounted, to account for the sale occurring in a single transaction now rather than numerous transactions over time. To determine fair market value for the purposes of just compensation, the comparable sales method is preferred, but the lot method may be used where no comparable sales exist and facts show that a market for individual lot sales is not speculative. *Id.* at 1265–66.

The crux of this review, then, is whether the district court abused its discretion when it determined that development of the tract as a mobile home subdivision had not progressed to the point where the sum of individual lot sales less costs was the valid measure of fair market value.

The district court characterized the condemned land in this case as a "ten year old paper subdivision and nothing more" and ruled that valuation should be based on the market for the tract as a whole and not on individual lot sales. In the district court's view, development of the tract as a subdivision had not reached the stage where there was a realistic market for individual lot sales. Consequently, valuing the tract by individual lot sales was speculative and not probative of fair market value. The court determined that the appropriate market was for the entire tract as investment property for future subdivision development. As such, the court held that evidence of individual lot sales *was* admissible to show what a willing investor would pay for the land as a potential subdivision.

Johnson argues that he laid a sufficient evidentiary foundation for the lot method evidence by showing a subdivision trend or partial development, relying primarily on *100 Acres of Land, supra,* in which the condemned portion of land was unimproved but was an integral part of a subdivision on

which some work had been completed. 468 F.2d at 1266. The court of appeals upheld the district court's admission of valuation evidence based on the lot method. *Id.* at 1267.

Johnson suggests that this case is so factually similar to *100 Acres of Land* that it was error for the district court to exclude the evidence. We disagree. The factual description in *100 Acres of Land* is simply too general to support such a conclusion. The court in that case does not describe the property beyond characterizing it as "part of a recreational and residential development in progress on the entire acreage" and stating that "preparatory physical work had already been completed" on the condemned tract. *Id.* at 1266. Here, some engineering plans had been drawn, some drainage work begun on other portions of the land, and a contract entered into with a utility provider.

 Given that the factual description of the property development in *100 Acres* is quite imprecise, we cannot find that the district court abused its discretion when it interpreted subdivision development in this case to be speculative rather than "imminent" as in *100 Acres*. *See id.* at 1266. The trial court necessarily had a more complete factual understanding of the case, and we have uncovered no case requiring the admission of lot method evidence on facts similar to those here. In addition, in a condemnation proceeding, the trial judge's role is much broader than in a conventional jury trial. *United States v. Reynolds*, 397 U.S. 14, 20, 90 S.Ct. 803, 807, 25 L.Ed.2d 12 (1970).

The only other relevant case cited by appellant Johnson is *Drakes Bay Land Co. v. United States*, 198 Ct.Cl. 506, 459 F.2d 504 (1972), where evidence of value derived from the lot method was admitted despite concededly minimal physical development on the taken land because evidence showed that subdivision development would have been substantial *but for* governmental activities related to the taking but occurring prior to the actual date of taking. *Id.* 459 F.2d at 507–11. For many reasons *Drakes Bay* does not militate in favor of reversal in this case.

First, the court in *Drakes Bay* determined that fair market value was not the total of individual lot sales, but must be adjusted downward to reflect that sale would be to a developer on a *wholesale* basis. *Id.* at 511. Thus, fair market value at the time of taking was a price for the entire acreage, taking into account its potential future use as a subdivision. To that extent, *Drakes Bay* supports the district court's ruling in this case.

Second, the circumstances of the government's pre-taking involvement are inapposite to the case at hand. In *Drakes Bay*, the government adopted legislation reserving parkland around the later-condemned portion and failed to fulfill promises of a property exchange with the landowner. The legislation "landlocked" the condemned tract, completely frustrating the owner's nascent development of the land.

In the case at hand, Johnson argues that the government's negotiations with the prior owner encouraged the owner to resist selling the property to Johnson, requiring Johnson to resort to lengthy litigation which delayed his acquisition and development of the property. However, this argument ignores the fact that Johnson acquired the option on the property knowing that the government had proposed to condemn the tract. Furthermore, compared with *Drakes Bay*, the causal connection in this case between the government's activities and the level of development at the time of taking is attenuated and speculative, as it turns on the subjective motivations of the prior owner. Evidence showed that the previous owner suspected that Johnson intended to inflate the value of the property in anticipation of a condemnation award. This testimony indicates that government action, unlike in *Drakes Bay*, was not the sole cause of alleged delay in the purchase and development of the property.

Finally, assuming *arguendo* that under *Drakes Bay* and *100 Acres of Land* the district judge would not have erred had he admitted the evidence, the inverse is not

true. The relevant caselaw simply does not indicate that exclusion of the evidence, given the facts of this case, constituted an abuse of discretion.

### B. Accountant's Testimony

■■■ Johnson also appeals the ruling which excluded testimony by Johnson's accountant, Norm Silcox, regarding his preparation of feasibility studies for developing San Joaquin Estates as a mobile home subdivision. Silcox testified on voir dire that he had no appraisal experience and had never conducted a discounted cash flow analysis of real estate, either as potential subdivision or as a raw land. Furthermore, he testified that he did not develop the numbers he used in his analysis. Consequently, the district court found that Silcox was not qualified as an expert in appraisal and was merely calculating numbers provided by Johnson that were not independently established as valid.

We find no error in the district court's ruling. District courts exercise broad discretion in admitting and excluding expert testimony, and proffered testimony is properly excluded when foundational facts demonstrating qualification are absent. *Lu-Metta v. United States Robotics, Inc.*, 824 F.2d 768, 771 (9th Cir.1987). Silcox's lack of training or practice as an appraiser and his personal unfamiliarity with the data demonstrate that he is not qualified to present expert witness testimony.

### C. Severance Damage Testimony

■■■ Johnson also argues that the trial court erred in ruling before trial that it would exclude evidence relating to damages for alleged severance damages to the property caused by the government's negotiations with Peskoff before the sale to Johnson. The ruling was not erroneous for several reasons.

Severance damages may be available when a partial taking adversely affects the value of the land remaining. *United States v. 1735 N. Lynn St.*, 676 F.Supp. 693, 698 (E.D.Va.1987) (citing *United States v. Grizzard*, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165 (1911)). However, where a landowner purchases with notice of the intended taking, he may not claim severance damages in a condemnation proceeding. *United States v. Mattox*, 375 F.2d 461, 463–64 (4th Cir.1967). "It offends our sense of justice that the Government should be required to pay [the owner of a condemned tract] an alleged damage to his fee tract which, if it occurred at all, occurred before he purchased." *Id.* at 464. The district court made a finding that Johnson had notice that the water project would likely run through the property before purchasing the option on the property, and thus the district court properly granted the government's motion in limine to exclude the evidence.

Alternatively, one could construe the claim as alleging that the government's activities effected a *de facto* taking of the remainder of the land not included in the condemned tract. *See e.g. Richmond Elks Hall Ass'n v. Richmond Redev. Agency*, 561 F.2d 1327 (9th Cir.1977). To support such a claim, the evidence would have to show that the government's actions deprived him of all economically viable use of the land. *Kaiser Dev. Co. v. City and County of Honolulu*, 913 F.2d 573, 575 (9th Cir.1990) (citing *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987)), *cert. denied*, —— U.S. ——, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991). Because Johnson's evidence only tended to show possible delay in his obtaining title, the evidence would not have met the standard of *Nollan*, and was properly excluded.

### D. Lot Sale Testimony

■■ Johnson also appeals the district court's ruling that it would exclude evidence of lot sales which occurred after the date of taking if introduced in support of lot method testimony. We do not find the ruling to be erroneous.

A district judge properly admits evidence of value within a reasonable period of time before and after the taking. *United States v. 57.09 Acres of Land*, 757 F.2d 1025, 1028 (9th Cir.1985). The district judge below only ruled that the evidence would be ex-

cluded if it were introduced in support of the lot method. We have upheld the district court's determination that the lot method was not a relevant measure of value in this case. The ruling explicitly allowed the evidence for other purposes, and the transcript reveals that such evidence was introduced. Therefore, the pre-trial ruling was not erroneous, and we affirm.

## II. *Denial of Motion for a New Trial*

 A district court's denial of a motion for a new trial is reviewed for abuse of discretion. *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir. 1988). A new trial is only warranted on the basis of an incorrect evidentiary ruling if the ruling substantially prejudiced a party. *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1457–59 (9th Cir.1983).

The trial court denied Johnson's motion for a new trial, which was based on the court's finding that the subdivision was "dormant," rendering the lot method of valuation inadmissible as not probative. In denying the motion, the court determined in the alternative that any error in precluding the testimony was not prejudicial, as opinions valuing the property at $2.5 million and $2.49 million were presented to the jury. According to the district court, the verdict of $713,000 makes clear that the jury did not credit the evidence of high value presented on Johnson's behalf by various witnesses, relying instead on the testimony of the government appraisers.

Johnson argues that the district court did not understand the requirements for the admissibility of lot method evidence, and thus erred in its exclusion of the evidence and in its denial of a motion for a new trial. As we have found that the trial court did not err in excluding the testimony, no grounds for a new trial exist.

## III. *Restitution of the Government's Overpayment*

The government deposited $1,000,000 as estimated just compensation for the property to be condemned. Upon depositing esti-

mated compensation, the Declaration of Taking Act authorizes the government to take immediate title to the land. 40 U.S.C.A. § 258a (West 1986). The court may then disburse part or all of the deposited amount. 40 U.S.C.A. § 258a.[2]

The estimated amount will often, if not always, differ from the final award. Thus, procedures exist to restore the amounts owed to the appropriate party. If the final award exceeds the amount paid to the owners, the court enters judgment against the United States for the deficiency. 40 U.S.C.A. § 258a. On the other hand, if the compensation to any defendant is less than the amount which has been paid to him or her, the court enters judgment against that defendant and in favor of the plaintiff for the overpayment. Fed.R.Civ.P. 71A(j).

As noted in the preceding factual summary, in this case the deposit exceeded the jury's award by $287,000. Consequently, the district court entered judgment for the amount against the beneficial and legal owners at the time of taking, and Southern Leasing, who at the time of taking held a lien on the property, and in fact received $963,000.00 of the $1,000,000.00 disbursed to the owners.

 Southern Leasing challenges the district court's authority to include it in the order on the grounds that Southern Leasing was not formally joined as a defendant in the action, and therefore is not liable under Rule 71A(j). The government argues that the court's broad power under 40 U.S.C. § 258a to enter orders with respect to liens includes the power to order that Southern Leasing, among others, restore the overpayment to the government. We agree.

Review of the district court's order requiring reimbursement pursuant to Rule 71A(j) is an issue of statutory interpretation which is reviewed *de novo*. *See United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1352 (9th Cir.1991).

Generally, only persons with ownership interests at the time of taking are entitled

---

**2.** Federal Rule of Civil Procedure 71A(j) provides that the court shall expedite the distribu- tion of moneys deposited with the court as compensation for a taking.

to compensation for a taking. *Milens of Cal. v. Richmond Redevelopment Agency,* 665 F.2d 906, 909 (9th Cir.1982). It is undisputed that Southern Leasing was not an owner of the property at that time. In federal condemnation actions, property ownership is determined by the law of the state in which the property is located. *See id.* On July 7, 1987, the date of taking, Southern Leasing held a deed of trust on the property, which in Arizona, creates a lien on the property but does not transfer title. *Cooley v. Veling,* 19 Ariz.App. 208, 505 P.2d 1381 (1973). As such, Southern Leasing was not entitled to the compensation award directly.

Nevertheless, lienholders enjoy certain rights related to the condemnation award. The award stands in place of the land. As such, valid liens on the land attach to the award and a lienholder may proceed in equity against the compensation award. *See e.g.* 4 Julius L. Sackman & Patrick J. Rohan, *Nichols on Eminent Domain* § 5.17 (1990); *Thibodo v. United States,* 187 F.2d 249, 255–56 (9th Cir.1951); *Swanson v. United States,* 156 F.2d 442 (9th Cir.1946), *cert. denied,* 329 U.S. 800, 67 S.Ct. 492, 91 L.Ed. 684 (1947).

In addition, 40 U.S.C. § 258a empowers the court to "make such orders in respect of encumbrances, *liens,* rents, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable" (emphasis added). This power includes the power to determine how much of the award is due encumbrances of the property, as well as the power to withhold a portion of the deposited amount sufficient to satisfy amounts owed by the landowner to a lienholder. *Swanson,* 156 F.2d at 447; *see also John Hancock Mutual Life Ins. Co. v. Thompson,* 147 F.2d 761 (1st Cir.1944).[3]

Southern Leasing was well aware of its rights as a lienholder, and was prepared to

exercise them fully. Although the government never formally joined Southern Leasing as a defendant in the action,[4] Southern Leasing was involved in other ways.

First, after the government deposited the $1,000,000, Southern Leasing contracted with the owners of the property to receive the lion's share of the deposited amount and a beneficial interest in any future awards that might exceed the estimated amount. A few days later, Southern Leasing filed a pleading entitled "Disclaimer" in which Southern Leasing stated it was appearing in the action and submitting to the jurisdiction of the court for the purpose of disclaiming any interest in the land involved in the condemnation proceedings. In essence, Southern Leasing attempted to cover all its bases.

Just before the jury rendered its verdict, Southern Leasing moved for leave to enter an appearance in the case, claiming an interest in the property it wished the court to protect despite its earlier disclaimer of any interest. Then, roughly a week after the jury verdict was returned for $173,000—less than Southern Leasing has already received by way of its contract with the owners—Southern Leasing withdrew its motion to appear. The court had not yet ruled on the motion.

Under the circumstance of this case, policy and equity dictate that Southern Leasing may be held liable for the overpayment. To determine otherwise would allow a windfall in contravention of the policies Congress intended to fulfill with the Declaration of Taking Act's scheme of immediate title for the government upon deposit of estimated compensation. Congress primarily intended to minimize the government's burden to pay interest on compensation wards and to alleviate temporary hardships to the landowner during the proceedings. *McKendry v. United States,* 219 F.2d 357

---

**3.** Both sides discuss *Gila River Ranch, Inc. v. United States,* 368 F.2d 354 (9th Cir.1966). However, since the reasoning of the decision is unclear, we do not rely on it in our decision.

**4.** Southern Leasing relies heavily on the fact it was not named in the complaint. However, this technical fact is not persuasive. Defendants can be added after the commencement of the action

under Rule 71A(c)(2), and pending final determination of ownership interests, the court is empowered to distribute the deposit as warranted by the facts known at the time. Thus, the caption of the complaint is not finally determinative of party status or interest in the proceedings.

(9th Cir.1955). Thus, 40 U.S.C. § 258a was intended to streamline the transfer of title for the advantage of both parties and to conserve government funds. Allowing Southern Leasing to retain the overpayment in this case would inhibit both policies.

First, in this case the government has paid more for the land than the jury determined was just compensation, thus unfairly overcharging the taxpayers who are funding the federal project. Second, allowing the government consistently to lose overpayments to lienholders, would encourage the government to deposit smaller amounts as estimated compensation, inconveniencing landowners by lowering the amount they receive in exchange for the loss of title at the time of taking.

Third, throughout the action, Southern Leasing was poised to seek judicial protection of its interest if financial advantage would be gained thereby, and when appearance in court did not appear advantageous, Southern Leasing relied on its private contractual arrangements. Southern Leasing kept both irons in the fire, so to speak, orchestrating the distribution of the deposit so as to receive nearly all of the deposited amount. Under the circumstances, equity dictates that Southern Leasing may be held liable for the amount by which the disbursement exceeded the just compensation awarded by the jury.[5]

For the reasons of equity and policy we affirm the order of the district court which held Southern Leasing liable for the overpaid compensation.

AFFIRMED.

---

**5.** Southern Leasing argues that rendering it liable for the overpayment would effect a takings itself, citing the inapposite *Murray v. United States,* 817 F.2d 1580 (Fed.Cir.1987), where a condemnation proceeding conducted without notice to a holder of a recorded lien was held to have been a taking of the lien, an interest protectible under the due process clause. Here, the district court at minimum considered Southern Leasing's arguments in its motion for relief from judgment and its opposition to the form of the order. Thus, the due process claim is unfounded.